# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

        Plaintiff,

vs.                            No. CR 09-2054

**NATHAN DAVID DEBREW, SR. et., al.**,

        Defendants.


## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Nathan Debrew Sr.'s *Motion to Suppress* [Doc. 35], filed August 5, 2009, and Defendant Nathan Debrew Jr.'s *Motion to Suppress Statement and Physical Evidence and Memorandum in Support Thereof* [Doc. 50], filed August 31, 2009.  On October 28, 2009, the Court held an evidentiary hearing on Defendants' motions.  Having fully considered the pleadings of record, the applicable law, the evidence and arguments of counsel presented at the hearing, and otherwise being fully advised in the premises, the Court denies the motions based upon the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A.    The Search of the Tractor Trailer and the Defendants' Arrests

1.    Ben Strain is a police officer with the State of New Mexico Department of Public Safety, Motor Transportation Division (MTD), and has been so employed since 2003. [Doc. 105 at 12].

2.      Officer Strain's duties include conducting inspections of commercial motor vehicles, a task for which he is certified through the Commercial Vehicle Safety Alliance (CVSA).  Officer Strain became certified in 2003.  [Id. at 13].

3.      As is relevant here, Officer Strain conducts Level II commercial-vehicle inspections, which he described as involving inspection of a truck driver's credentials, the truck itself, the trailer, and the contents of the load. [Id.].

4.      Officer Strain testified that he has performed "[p]robably several thousand" Level II inspections. [Id. at 14].  Given that Officer Strain has been certified since 2003, I find and accept as credible his estimate of having performed thousands of Level II inspections.

5.      I take judicial notice of the description of a Level II commercial-vehicle inspection as set forth in the *Memorandum Opinion and Order* docketed as entry number 61, paragraph 21, in United States v. Ameth Choundoull, 09cr488 MCA (Sept. 22, 2009).

6.      On November 24, 2008, Officer Strain was on duty at the MTD Inspection Station in Lordsburg, New Mexico, when a tractor trailer being driven by Defendant Nathan Debrew Sr. entered the station at approximately 6:00 p.m. [Doc. 105 at 16].

7.      The tractor and the trailer were owned by Cook's Moving Service Inc., as indicated on the vehicle. [See Exh. 3].  Mr. Debrew Sr. was an employee of Cook's Moving Service. [Exh. 10 and "Recorded Interview Transcription of Nathan Debrew, Sr." (hereinafter "Debrew Sr. Transcription") at 6].  However, pursuant to a purchase agreement, Mr. Debrew was making payments on the tractor to Mr. Harold Cook.

2

[Doc. 105 at 111-112].

8.    According to Officer Strain, MTD Inspector James Tarango greeted Mr. Debrew Sr., explained that Mr. Debrew Sr. would need to purchase a New Mexico permit, and advised that the tractor trailer was going to be inspected. [Doc. 105 at 14].

9.    Accordingly, Mr. Debrew Sr. parked his tractor trailer and handed his credentials to Inspector Tarango, who in turn gave them to Officer Strain.  Credentials include tractor trailer registration, bills of lading, log books, commercial driver's license, and medical cards. [Id. at 15].

10.    Officer Strain began by reviewing Mr. Debrew Sr.'s log book, which he described as "a record of duty status" and a reflection of the hours a trucker works. [Id.].

11.    According to Officer Strain, Mr. Debrew Sr., who was heading east, had marked in his log book that he had already reached El Paso, Texas at 5:30 a.m.  Exhibit 1 is a copy of Mr. Debrew Sr.'s log book from November 24, 2008.  The document appears to bear a notation stating "Inspection Filed El Paso." It also shows a "From" destination of Hampton, Virginia, and a "To" destination of Apple Valley, California. There is no co-driver noted in the log book.  [See Exh. 1].

12.    Officer Strain testified that because Mr. Debrew Sr. was "showing that he's somewhere ahead of course whenever he's actually in Lordsburg[,]" Officer Strain believed that Mr. Debrew Sr. had falsified his log book, which "raise[d] . . . a red flag in [his] mind." [Doc. 105 at 17].

13.    However, Officer Strain also testified as to the "11-hour rule," whereby truckers are

permitted to drive for 11 hours but then must "shut down" for 10 hours to avoid being in violation of regulations.  [Id. at 46].

14.   Officer Strain testified that a trucker who is found to have violated the 11-hour rule will be cited and placed out of service and may, if the violation is repeated, lose his commercial driver's license. [Id. at 46-47].

15.   Officer Strain also admitted that he is aware that truckers will sometimes falsely note in their log books that they have reached their destination before they actually have, in order to circumvent the 11-hour rule. [Id. at 47].

16.   Notwithstanding Officer Strain's knowledge that drivers may falsify log books to circumvent the requirements of the 11-hour rule, I find and accept as credible Officer Strain's testimony that Mr. Debrew Sr.'s log book for November 24, 2008 caused him to become suspicious.  I find that it was reasonable for Officer Strain to question the November 24, 2008 entry, inasmuch as that entry indicated not that Mr. Debrew Sr. had noted a destination that he had not yet reached but, instead, indicated that Mr. Debrew Sr. had been in El Paso approximately 12 hours earlier, and was now headed back in the same easterly direction. [See Exh. 1].

17.   Officer Strain then examined Mr. Debrew Sr's bill of lading. [Id. at 17].

18.   Exhibit 2 is a copy of Mr. Debrew Sr.'s bill of lading.  It is handwritten and, under "Household Goods Descriptive Inventory," indicates a customer name and a delivery address.  Among the spaces left empty are "Contractor or Carrier," "Origin Loading Address," "Agent," and "Van Number." [Exh. 2].

19. Officer Strain testified that while he has seen handwritten bills of lading, they are usually accompanied by a typed bill of lading, and also will specify pick-up and delivery locations, as well as the name, address, and telephone number of the cargo owner. [Doc. 105 at 17-18].

20. According to Officer Strain, none of these specifics was indicated on Mr. Debrew Sr.'s bill of lading, nor was Officer Strain able to identify with certainty what Mr. Debrew was carrying or Mr. Debrew Sr.'s delivery destination. [Id. at 18].

21. Officer Strain admitted, however, that movers do not always pack the household goods that they transport, and that if the owner packs his or her own boxes, Officer Strain would not expect a driver such as Mr. Debrew Sr. to look through the boxes in order to make a detailed list of the contents. [Id. at 39].

22. In this case, "Condition at Origin" for the boxes listed on Mr. Debrew Sr.'s bill of lading is indicated as "PBO," which stands for "Packed by Owner." [Exh. 2].

23. When Officer Strain asked Mr. Debrew Sr. to explain the bill of lading, Mr. Debrew responded that "he was hauling eight boxes of—of a military load." [Doc. 105 at 19]. Eight boxes are listed under "Articles" on the bill of lading. [Exh. 2].

24. Mr. Debrew Sr.'s response—that he was moving eight boxes of military household goods—struck Officer Strain as "[a]bsolutely" suspicious because in Officer Strain's experience, military moves involve

> a lot of articles.  It's a big move.  It's—it's taking somebody's house and putting it inside of a trailer, and to be moving eight boxes of a military load across [the] country from California to

5

the east coast is just—it's just very uncommon.  It's something
that I've not seen before.

[Doc. 105 at 19].

25.   Officer Strain further testified that because military household moves are federal in
      nature, they generate a lot of paperwork, which was missing here. [Id. at 19-20].

26.   After he examined Mr. Debrew Sr.'s log book, and as he was reviewing the bill of
      lading, Officer Strain began his Level II walk-around inspection of the tractor trailer.
      Along with Inspector Tarango, Officer Strain checked the lights, the tires, "and so
      forth" and noted no violations. [Id. at 20].

27.   Officer Strain then asked Mr. Debrew Sr. to open the trailer. [Id. at 21].

28.   According to Officer Strain, as Mr. Debrew Sr. unlocked the trailer his hands were
      shaking, which Officer Strain interpreted "as a sign of nervousness. . . ." [Id. at 22].
      While Officer Strain admitted that shaking can occur for reasons other than
      nervousness (a medical condition, for example), he also testified that Mr. Debrew
      Sr.'s shaking hands nevertheless raised suspicion, particularly when considered in
      conjunction with what Officer Strain believed to be a falsified log book and a
      questionable bill of lading. [Id.].

29.   I find and accept as credible Officer Strain's testimony that he believed Mr. Debrew
      Sr.'s hands were shaking from nervousness.

30.   When Mr. Debrew Sr. finally opened the trailer, he made a point of telling Officer
      Strain that he had spare tries in the back. [Doc. 105 at 21].

31.     Officer Strain found it unusual that Mr. Debrew Sr. would call his attention to spare tires, since every trailer carries spare tires but no driver had ever made a point of drawing Officer Strain's attention to that fact. Thus, "in [Officer Strain's] mind, [Mr. Debrew Sr.] was trying to direct [Officer Strain's] attention towards the rear of the trailer."[Id. at 22-23]. At the *front* of the trailer were a number of boxes that appeared to be secured. [See Exh. 4].

32.     Additionally, Officer Strain testified that Mr. Debrew Sr. attempted to enter the trailer. Officer Strain testified that this is not common, usual, or typical, since drivers know what is in the trailer; know that Officer Strain is entering for the purpose of inspection; and have no reason to be in the trailer during the inspection. [Id. at 23-24].

33.     I find and accept as credible Officer Strain's testimony that he became suspicious of Mr. Debrew Sr.'s behavior in (1) making a point of calling Officer Strain's attention to the spare tires, and (2) attempting to enter the trailer with Officer Strain.

34.     Once inside the trailer, Officer Strain observed blanket-covered boxes. Exhibit 4 depicts the scene after Officer Strain had moved some of the blankets out of the way. [Exh. 4; see also Doc. 105 at 24-25]. Officer Strain testified that when he first saw the boxes, all but the box in the far right back corner and the box standing upright in the center front, see Exh. 4, were under blankets.

35.     At the suppression hearing, Officer Strain was asked if he had ever known blankets to be used to separate loads being transported during a multi-load haul. He responded, "Not blankets, no." [Doc. 105 at 52].

7

36. Officer Strain further testified that "blankets are used to cover up furniture, cabinets, chest[s] of drawers, anything that—that would possibly be scratched or dented or just dinged up. I—I've not come across an instance where they needed to cover up the boxes." [Id. at 25].

37. Officer Strain did not believe that there was a securement problem with the boxes. Nevertheless, he decided to cut one of them open. When he did, he discovered cellophane-wrapped packages. Officer Strain then cut the cellophane. It was then for the first time that Officer Strain smelled what he believed to be marijuana. [Id. at 30-31].

38. At the suppression hearing, Officer Strain identified Exhibit 5 as a depiction of bundles of marijuana. [Id. at 27]. I find that Exhibit 5 depicts what appears to be at least six cellophane-wrapped bundles. [See Exh. 5].

39. Even though Mr. Debrew Sr.'s bill of lading indicated that he was carrying household goods, and at least two of the boxes in his trailer were marked "Bedroom," see Exh. C; see also Doc. 105 at 41, Officer Strain believed that he was justified in opening a box to verify cargo contents as part of his Level II inspection. [Doc. 105 at 42].

40. Officer Strain further testified that it is his practice to open boxes in order to verify cargo contents as part of a Level II inspection, regardless of whether he also possesses suspicion as to the contents. [Id.].

41. After discovering the marijuana, Officer Strain placed Mr. Debrew Sr. under arrest. [Id. at 53].

8

42.    It was then that Officer Strain learned that Mr. Debrew Sr.'s son, Defendant Nathan Debrew Jr., also was in the tractor.  Officer Strain ordered Mr. Debrew Jr. out of the tractor and placed him under arrest for possession of marijuana. [Id.].

43.    Mr. Debrew Jr. does not possess a commercial driver's license. [Id. at 114].

44.    When asked at the suppression hearing what information he had to link Mr. Debrew Jr. to the marijuana, Officer Strain testified that Mr. Debrew Jr. "was an unauthorized passenger on board of a commercial vehicle, and he was inside of the vehicle during the entire trip." [Id. at 54].

45.    Officer Strain also testified, however, that (1) the trailer had been locked; (2) Mr. Debrew Sr. had the key to the locked trailer; (3) it was not possible to move from the tractor to the trailer without going through the locked rear; and (4) Mr. Debrew Jr. was removed from the tractor, not the trailer, portion of the vehicle.  [Id. at 53].

46.    After the Debrews were arrested, MTD Officer Benjamin Chavez searched a duffle bag that was in the center of the trailer.  Inside the duffle bag, Officer Chavez found a Smith and Wesson 9 mm handgun, a holster, and a magazine with twelve 9-mm bullets. [Doc. 47 at 3].

### B.    Mr. Debrew Sr.'s Statement[1]

47.    Following the Debrews' arrests, they were moved into the Port's administrative building, where they were each questioned—separately—by New Mexico State Police Officers Corey Watkins and Phil Candelaria, both of whom were at that time assigned to the Border Operations ICE Task Force. [Doc. 105 at 65, 70].

48.    Agents Watkins and Candelaria first questioned Mr. Debrew Sr.  Also present during the interview of Mr. Debrew Sr. was Lieutenant Greg Kerr, supervisor for the Lordsburg Port of Entry. [Id. at 69].

_____

[1] Mr. Debrew Jr., like Mr. Debrew Sr., also had originally sought to suppress the statement he made after his arrest.  In his motion, Mr. Debrew Jr. argued that his statement was procured in violation of Miranda, since he had requested an attorney but was "blatantly ignor[ed]." [Doc. 50 at 6].

In response, the Government maintained that Mr. Debrew Jr.'s alleged requests for an attorney were ambiguous and equivocal and, therefore, insufficiently clear to allow the questioning agents to understand that he was asking for a lawyer. [See Doc. 54 at 12-13 (citing Davis v. United States, 512 U.S. 452, 459 (1994)].

However, referring to "the closeness of the question," the Government agreed not to introduce Mr. Debrew Jr.'s statement beyond the point at which he questioned the fairness of his situation. [See Doc. 54 at 4, 15].

At the suppression hearing, the Government clarified that, with the exception of certain portions specifically identified during the hearing, it has agreed not to introduce Mr. Debrew Jr's statement during its case in chief. [See Doc. 105 at 6 (specifying portions to be introduced)]. Counsel for Mr. Debrew Jr. advised the Court that she does not object to the introduction of the specifically identified portions of Mr. Debrew Jr.'s statement during the Government's case in chief. [Id. at 7].  Counsel also (1) informed the Court that Mr. Debrew Jr.'s statement is no longer a subject of his motion to dismiss; (2) asked no questions about Mr. Debrew Jr.'s statement during the suppression hearing; and (3) did not address Mr. Debrew Jr.'s statement in her written closing argument on his motion to suppress. [See id. at 7 and 94; see also Doc. 119]. For these reasons, I do not address Mr. Debrew's statement in this Memorandum Opinion and Order.

49.    Exhibit 10 is a CD recording of the agents' interview with Mr. Debrew Sr.  The
       interview also was transcribed.  [See Exh. 10 and Debrew Sr. Transcription].

50.    The interview lasted for 33 minutes, during which time Mr. Debrew Sr. was not
       handcuffed. [Exh. 10; Doc. 105 at 69].  The interview occurred in what Officer
       Watkins described as "the typical standard office setting[, which included] a desk, few
       chairs, pictures on the wall, a computer on the desk . . . couple windows." [Doc. 105
       at 69, 79].

51.    During the interview, Officer Watkins sat behind the desk.  Mr. Debrew Sr. sat on the
       other side of the desk, and Officer Candelaria sat next to Mr. Debrew Sr.  Lieutenant
       Kerr was leaning against a wall.  According to Officer Watkins, he and Officer
       Candelaria were dressed in "typical street clothes, jeans . . . decent shirt, polo, that
       type of thing." [Id. at 79].  Lieutenant Kerr was in uniform.

52.    Officer Watkins testified that neither he nor Agent Candelaria was armed. [Id.].

53.    Prior to asking Mr. Debrew Sr. any questions, Agent Candelaria advised him of his
       rights under Miranda v. Arizona, 384 U.S. 436, 467 (1966).  Mr. Debrew Sr. told the
       agents that he understood his rights and, at 8:20 p.m., signed a *Border Operations
       Task Force Advise/Waiver of Rights* form waiving those rights.  [See Exh. 9; Debrew
       Sr. Transcription at 6].

54.    Among other things, Mr. Debrew Sr. told the agents that he and Mr. Debrew Jr. had
       met "a Spanish guy [with] a rental truck" near a Tucson, Arizona, Triple T truck stop,
       during the late hours of November 23, 2008, or the early hours of November 24,

11

2008.  Mr. Debrew did not know the man he met.  Still, the unknown man loaded boxes from his U-Haul van into Mr. Debrew Sr.'s tractor trailer.  Mr. Debrew Sr. explained that he did not ask what was in the boxes, but "figure[d]" from the light weight of the one box he pushed through the trailer that it did not house the television it purported to contain.  [See Debrew Sr. Transcription at 8, 17-18, 24].

55.   Throughout their interview with Mr. Debrew Sr., Agents Watkins and Candelaria made such comments as, "If you can help us, we'll do what we can to help you[;]" "You guys are in a bad position[;]" "I've seen [people] walk away from this stuff [or] just get[] a little bit of time[;]" "You gotta be honest[;]" "You gotta give me leverage[;]" "[I]f you know more, you might as well tell me the whole thing[;]" "[I]f you're gonna go in front of the judge and jury and say, I knew this, I knew this, I knew this, I did this, this and this, but I didn't know, man, they're gonna—they're gonna hammer you, I'm telling you right now[;]" and "I really wish you'd come clean with something. . . ." [Id. at 8, 13, 14, 22, 23, 26, 34, 40].

56.   Agent Candelaria also made a point of telling Mr. Debrew Sr. that he was an out-of-state truck driver caught with drugs in a border state whose residents "ain't stupid," and that Mr. Debrew Sr. was "going down on that."  [Id. at 32, 33].

57.   Reminding Mr. Debrew Sr., who had previously been convicted of a federal offense, that the federal system "works on a point system[,]" Agent Candelaria told Mr. Debrew Sr.,

> I know that we are puttin' you under the gun a little bit right
> now sayin', You know, we need this right now, right now.  But
> . . . the longer time goes by, the less points you re eligible to get,
> okay? Right now is where—where you get the most value out of
> that information, the most amount of points you could possibly
> get to knock that time down to whatever you can.

[Id. at 34].

58. However, Agent Candelaria also advised Mr. Debrew Sr. that "we can't promise you
anything, and we're not going to." [Id. at 14].  Moreover, the *Waiver of Rights* form
that Agent Watkins read aloud to Mr. Debrew Sr., and that Mr. Debrew Sr. both
signed and initialed, expressly states that he is waiving his rights to remain silent and
to consult an attorney "without any promise of reward or immunity." [Exh. 9].

59. From multiple reviews of Mr. Debrew Sr.'s recorded interview, I find that the
questioning agents maintained a professional, cordial, and non-threatening tone
throughout.  At no point during the interview can the agents be heard to raise their
voices.  [See Exh. 10].

60. I also find that Mr. Debrew Sr. comes across as calm, cooperative, and agreeable.
I further describe his manner, as conveyed through his tone of voice, as phlegmatic.
Mr. Debrew Sr. is deliberate and contemplative in his responses.  [See id.].

61. I find that Mr. Debrew Sr. made his statement voluntarily, and not as a result of
coercion or duress.

## II. LEGAL ANALYSIS AND CONCLUSIONS OF LAW

On September 16, 2009, Nathan Debrew Sr. and Nathan Debrew Jr. were charged in a 4-count *Superseding Indictment* with (1) conspiracy, in violation of 21 U.S.C. § 846 (Mr. Debrew Sr. and Mr. Debrew Jr.); (2) possession with intent to distribute 100 kilograms and more of marijuana/aiding and abetting, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)/18 U.S.C. § 2 (Mr. Debrew Sr. and Mr. Debrew Jr.); (3) use and carry of a firearm during and in relation to a drug trafficking crime and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Mr. Debrew Sr.); and (4) being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Mr. Debrew Sr.). [Doc. 55].

On August 5, 2009, Mr. Debrew Sr. filed his *Motion to Suppress*, seeking to exclude from trial any and all physical evidence seized on November 24, 2008, as well as the statement he made after his arrest.  Mr. Debrew Sr. contends that the search of the trailer exceeded the bounds of a permissible regulatory search and also was conducted in the absence of probable cause; accordingly, he argues, any evidence obtained as a result must be suppressed as fruit of the poisonous tree. [Doc. 35 at 3].  Mr. Debrew also maintains that the post-arrest statement he made similarly constitutes fruit of the poisonous tree and, alternatively, should be suppressed as having been involuntarily made. [Id. at 3-4].

On August 31, 2009, Mr. Debrew Jr. filed his *Motion to Suppress Statement and Physical Evidence and Memorandum in Support Thereof*, also seeking to exclude all physical evidence seized and statements made after the November 24, 2008, search and his arrest.

14

With respect to the search, Mr. Debrew Jr. makes the same argument as that set forth by Mr. Debrew Sr.—that Officer Strain's search exceeded the bounds of a permissible regulatory search and also was conducted in the absence of probable cause. [Doc. 50 at 4]. Mr. Debrew Jr. also maintains that Officer Strain did not have probable cause to arrest him. [Id. at 3].

As explained more fully in footnote 1 of this *Memorandum Opinion and Order*, counsel for Mr. Debrew Jr. represented at the suppression hearing that those parts of Mr. Debrew Jr.'s post-arrest statement that the Government intends to introduce in its case in chief are neither objected to nor are they the subject of his motion to suppress. [See Doc. 105 at 6-7]. For this reason, I do not address further Mr. Debrew Jr.'s post-arrest statement.

**A.**     **Nathan Debrew Sr.'s *Motion to Suppress* [Doc. 35]**

**1.**     **The Search as an Inspection in a Closely Regulated Industry**[2]

---

[2] Although not expressly raised by any party during the suppression hearing, in his written closing argument, Mr. Debrew Sr. addressed the issue of standing, explaining that, during the hearing, the government "did enter evidence of the ownership of the tractor-trailer in question." [Doc. 115 at 12].

To establish standing to challenge a vehicle, a non-owner/driver bears the burden of showing that he had a legitimate possessory interest in, or lawful control over, the vehicle. United States v. Valdez Hocker, 333 F.3d 1206, 1209 (10th Cir. 2003). Indeed, "[d]rivers who credibly testify they had permission to drive from the registered owner, 'plainly have a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle.'" United States v. Carel, 133 Fed.Appx. 497 n.1 (10th Cir. 2005) (unpublished opinion) (*quoting* Valdez Hocker, 333 F.3d at 1208-09).

In this case, Mr. Debrew Sr. credibly testified that the trailer was owned by Mr. Harold Cook, and that he (Mr. Debrew Sr.) was making payments through a purchase agreement to buy the tractor. [Doc. 105 at 111-112]. Mr. Debrew Sr. also explained that he and Mr. Cook had an arrangement whereby they shared in the profits made from Mr. Debrew Sr.'s total line haul. [Id. at 111]. When asked whether he was an employee of Cook's Moving Service, Mr. Debrew Sr. responded, "Yes. I'm leased to Cook's." [Id. at 110].

As previously explained, the tractor trailer at issue was searched after the Debrews' arrival at the Lordsburg port of entry.  New Mexico law requires all commercial carriers entering or leaving New Mexico to stop at all ports of entry, and personnel assigned to the ports of entry are authorized to inspect commercial vehicles and their documentation to determine whether the vehicles, drivers, and cargo are in compliance with state laws regarding public safety, health, and welfare.  United States v. Vasquez-Castillo, 258 F.3d 1207, 1209 (10th Cir. 2001) (citing N.M. STAT. ANN. § 65-5-1).

"[C]ommercial trucking is an industry closely regulated by both federal and state governments." Vasquez-Castillo, 258 F.3d at 1209.  For this reason, the warrantless search of a tractor trailer is analyzed under the framework set forth in New York v. Burger, 482 U.S. 691, 702-703 (1987).

Burger established the following three-part test for determining whether a warrantless inspection of a closely regulated industry violates the Fourth Amendment:

> First, there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made. Second, the warrantless inspections must be necessary to further the regulatory scheme. . . .  Finally, the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant.

---

I find that Mr. Debrew Sr. clearly had permission from the vehicle's owner, Harold Cook, to be driving the tractor trailer, and was in lawful control of it on November 24, 2008. Accordingly, I find that Mr. Debrew Sr. had a reasonable expectation of privacy in the vehicle and, therefore, has standing to challenge the search.  See Valdez Hocker, 333 F.3d at 1209.

Vasquez-Castillo, 258 F.3d at 1210 (*quoting* Burger, 482 U.S. at 702-703).  Both the Tenth Circuit and this Court have previously upheld New Mexico's regulatory scheme for conducting warrantless inspections of the commercial trucking industry at its ports of entry pursuant to the Burger test.  See United States v. Mitchell, 518 F.3d 740 (10th Cir. 2008); Vasquez-Castillo, 258 F.3d 1207; United States v. Gwathney, 465 F.3d 1133 (10th Cir. 2006); United States v. Michael, No. CR 06-1833 MCA, Doc. 72 (D.N.M. June 22, 2007) (unpublished memorandum opinion and order).

Mr. Debrew Sr. argues that "in this case . . . the warrantless search failed to provide a constitutionally adequate substitution for a warrant, as required in Burger," and also that "Officer Strain did not follow the standard procedure for a Level 2 safety inspection prior to cutting open the U-Haul boxes, resulting in the search herein far exceeding the purpose and intent of New Mexico's regulatory scheme. . . ." [Doc. 35 at 3].

With respect to Mr. Debrew Sr.'s argument that the search failed to provide a constitutionally adequate substitution for a warrant, it should be noted that it is not the search itself but, rather, the regulatory scheme that must satisfy Burger.  To be sure, the Tenth Circuit has explained that "'the Burger criteria are applied generally to a statutory scheme, not to a given set of facts arising under that scheme.'" Gwathney, 465 F.3d at 1140 (*quoting* United States v. Maldonado, 356 F.3d 130, 136 (1st Cir.2004)).  Accordingly, I reject Mr. Debrew Sr.'s first argument.

As to whether Officer Strain followed the standard procedure for a Level II commercial-vehicle inspection, I note that neither the government nor Mr. Debrew Sr.

presented evidence as to what, precisely a Level II inspection entails.  However, I have taken

judicial notice of the description of a Level II commercial-vehicle inspection as set forth in

the *Memorandum Opinion and Order* docketed as entry number 61 in United States v. Ameth

Choundoull, 09cr488 MCA (Sept. 22, 2009).  A Level II inspection is described by the

Federal Motor Carrier Safety Administration as

> [a]n examination that includes each of the items specified under
> the North American Standard Inspection. At a minimum, Level
> II inspections must include examination of: driver's license,
> medical examinees certificate and waiver, if applicable, alcohol
> and drugs, driver's record of duty status as required, hours of
> service, seat belt, vehicle inspection report, brake system,
> coupling devices, exhaust system, frame, fuel system, turn
> signals, brake lamps, tail lamps, head lamps, lamps on
> projecting loads, safe loading, steering mechanism, suspension,
> tires, van and open-top trailer bodies, wheels and rims,
> windshield wipers, emergency exits on buses, and HM
> requirements, as applicable. It is contemplated that the
> walk-around driver/vehicle inspection will include only those
> items which can be inspected without physically getting under
> the vehicle.

[See United States v. Ameth Choundoull, 09cr488 MCA, Doc. 61 at 6-7; ¶ 21 (Sept. 22,

2009)].

In this case, Officer Strain explained that, in the course of his Level II inspection, he

examined Mr. Debrew Sr.'s credentials, which included the tractor trailer registration, bill

of lading, log book, commercial driver's license, and medical card. [Doc. 105 at 15].  Officer

Strain credibly testified that Mr. Debrew Sr.'s log book "raise[d] a . . . red flag in [his]

mind[,]" id. at 17, and that his handwritten and "scribbled" bill of lading caused him to

become "[a]bsolutely" suspicious, id. at 18, 19.  After he reviewed Mr. Debrew Sr.'s

credentials, Officer Strain began the physical inspection of the tractor trailer, which he described as walking around the vehicle "checking the lights, checking the tires, and so forth." [Id. at 19]. Noting no violations, Officer Strain then asked Mr. Debrew Sr. to open the trailer.

The Tenth Circuit has held that "'New Mexico's regulatory scheme clearly contemplates entrance into the trailer to inspect blocking and bracing, and also allows inspection of the contents of the vehicle.'" Mitchell, 518 F.3d at 752 (quoting Gwathney, 465 F.3d at 1139). Accordingly, there can be no real question that Officer Strain was authorized to enter the trailer, at least for the purpose of checking blocking and bracing, and Mr. Debrew Sr. does not appear to argue to the contrary. Instead, Mr. Debrew Sr.'s argument is that § 65-1-1 does not authorize port of entry inspectors to open and search individual items or containers that make up the cargo once they have verified that the cargo was safely loaded. [See Doc. 115 at 5-6 ("There is no issue that the spare tires and boxes were safely loaded. Strain had verified that the cargo was safely loaded before he cut open the boxes.")]. Mr. Debrew Sr. points out that "[t]he word 'contents' in the statute is not defined" and submits that the issue of an inspector's "authority under the statute to open individual containers in the trailer . . . has not been decided in this district." [Id. at 5].

On the one hand, it is true that in Vasquez-Castillo, the Tenth Circuit determined that because the inspecting officer in that case "permissibly entered the trailer to inspect the blocking and bracing, [the Circuit was not required to] consider whether he also could have entered the trailer to inspect the cargo." Vasquez-Castillo, 258 F.3d at 1212 n.3. Similarly,

19

in Gwathney, the Circuit did not need to "decide if New Mexico's regulatory scheme authorized the actual opening of boxes, because [it] agree[d] with the district court that on the facts" before it, the inspecting officer possessed probable cause to cut into and search the containers in question.  Gwathney, 465 F.3d at 1140.

On the other hand, even though § 65-1-1 does not define "contents," subsection (D) provides, in pertinent part, that "[t]he person in charge of the port of entry may confirm the contents of the cargo. . . ."  N.M. STAT. ANN. § 65-5-1(D).[3]  It is well established that "[w]hen interpreting a statute, [courts] must give words their 'ordinary or natural' meaning." Leocal v. Ashcroft, 543 U.S. 1, 9 (2004) (quoting Smith v. United States, 508 U.S. 223, 228 (1993)).

Merriam-Webster's Collegiate Dictionary defines "content" as "something contained."  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 250 (10th ed. 1993).  It defines "cargo" as "the goods or merchandise conveyed in a ship, airplane, or vehicle."  Id. at 173. Given these definitions, and the court's task of interpreting words according to their plain meaning, it could be argued that "contents of the cargo," as used in § 65-5-1(D), refers to the actual items contained within individual containers.  Fortunately, however, this Court need

---

[3]  In its entirety, subsection (D) provides that

> The person in charge of the port of entry may confirm the contents
> of the cargo and the weight thereof and is authorized to interview
> operators to obtain information in respect thereto and, if in doubt
> as to the declared gross weight, may order the cargo weighed
> before issuing any clearance certificate for the motor vehicle.

N.M. STAT. ANN. § 65-5-1(D).

not conclusively determine whether New Mexico's regulatory scheme authorized Officer

Strain to cut into and search individual boxes inside Mr. Debrew Sr.'s trailer because  the

Court determines that Officer Strain had probable cause to do so.

### 2.      Probable Cause to Search the Trailer

"'Probable cause to search a vehicle is established if, under the totality of the

circumstances, there is a fair probability that the [vehicle] contains contraband or evidence.'"

Vasquez-Castillo, 258 F.3d at 1212 (*quoting*  United States v. Downs, 151 F.3d 1301, 1303

(10th Cir.1998)).  In other words, probable cause exists where "the detaining officer has a

'particularized and objective basis' for suspecting legal wrongdoing."  United States v.

Ledesma, 447 F.3d 1307, 1316 (10th Cir. 2006) (*quoting* United States v. Arvizu, 534 U.S.

266, 273 (2002)).  A law enforcement officer's subjective belief as to the existence of

probable cause is not determinative.  United States v. Treto-Haro, 287 F.3d 1000, 1006 (10th

Cir. 2002).  For that reason, the fact that a law enforcement officer may not have subjectively

believed that probable cause existed "does not preclude the Government from justifying the

suspect's [arrest] by establishing probable cause."  United States v. Santana-Garcia, 264 F.3d

1188, 1192 (10th Cir. 2001).

The "totality of the circumstances" analysis focuses on whether the facts observed by

law enforcement officers, when taken as a whole, rather than in isolation, indicate a fair

probability of illegal conduct.  See Ledesma, 447 F.3d at 1316.  Thus, while the Court

examines each factor supporting—as well as mitigating against—probable cause, no single

factor is determinative.  Indeed, "[e]ven where a particular factor, considered in isolation, is

of limited significance and must be discounted, it nonetheless may affect the Fourth Amendment analysis when combined with other indicia of probable cause or reasonable suspicion." Id. (internal quotations and alterations omitted).  Consequently, rather than examine how each factor might add up to reasonable suspicion individually, it is the task of the Court to "evaluate how convincingly they fit together into a cohesive, convincing picture of illegal conduct." United States v. Guerrero, 472 F.3d 784, 787 (10th Cir. 2007).

It is important to remember that the determination as to the existence of probable cause "is made from the perspective of the reasonable *officer*, not the reasonable *person*." United States v. Quintana-Garcia, 343 F.3d 1266, 1270 (10th Cir. 2003) (emphasis in original).  Additionally, in assessing probable cause, courts "defer to trained law enforcement personnel, allowing officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Guerrero, 472 F.3d at 787 (internal quotations and alterations omitted).  Finally, "'[i]t is well established that although probable cause to search a [vehicle] may not exist when [it] is first stopped for a traffic citation, it can arise during the course of the stop.'" Vasquez-Castillo, 258 F.3d at 1213 (*quoting* United States v. West, 219 F.3d 1171, 1178 (10th Cir. 2000)).

In this case, Officer Strain testified as to the following factors supporting probable cause to believe that criminal activity was afoot: (1) Mr. Debrew Sr.'s questionable explanation as to his travel to and from El Paso; (2) a bill of lading that Inspector Strain believed to be fraudulent; (3) the fact that Inspector Strain did not believe that the small load

22

Mr. Debrew Sr. was hauling would pay for a cross-country trip; (4) Mr. Debrew Sr.'s apparent nervousness; (5) Mr. Debrew Sr.'s unusual behavior in attempting to climb into the trailer; and (6) cargo that Inspector Strain believed was being intentionally hidden beneath blankets.

At the suppression hearing, counsel for Mr. Debrew Sr. attempted to break these factors down and explain each as innocent behavior.   For example, when cross-examined as to why Mr. Debrew's log book might have inaccurately indicated that he was in El Paso when he clearly was not, Officer Strain explained the 11-hour rule, whereby truck drivers will sometimes falsify their log books to show arrival at a destination they have not actually reached in order to drive more hours.  When questioned as to his suspicion that Mr. Debrew Sr.'s load seemed too small to pay the expenses of cross-country travel, Officer Strain admitted that sometimes truck drivers will haul small loads in order to cover at least some of their costs.  Officer Strain also agreed with counsel for Mr. Debrew Sr. that shaking hands can be a sign of something other than nervousness.

The problem with considering each factor separately, in isolation and apart from the manner in which they fit together given the entirety of the situation, is that such an approach advances the "divide and conquer" method that has been rejected by the United States Supreme Court.  See Arvizu, 534 U.S. at 267; see also United States v. Valenzuela, 365 F.3d 892, 897 (10th Cir. 2004) ("[C]ourts may not engage in a 'divide-and-conquer' analysis of facts to determine whether probable cause existed.").  Thus, while it is conceivable that each factor cited by Officer Strain, if separated from the others and considered in its own vacuum,

might be susceptible of an innocent explanation, the real question is whether a reasonable law enforcement officer, drawing on his experience and training, could objectively have believed that, in light of the entire situation, legal wrongdoing was afoot.

In this case, given the totality of the circumstances, Officer Strain possessed the necessary "particularized and objective basis" for suspecting that illegal conduct was occurring. See Ledesma, 447 F.3d at 1316. Officer Strain credibly testified that Mr. Debrew Sr.'s log book entry for November 24, 2008 "raise[d] . . . a red flag in [his] mind[,]" and that the handwritten, incomplete, and illegible bill of lading indicating a relatively small military load caused him to become "absolutely" suspicious. [Doc. 105 at 17, 19]. While he admitted that shaking hands can be caused by, for example, a medical condition, Officer Strain nevertheless interpreted Mr. Debrew Sr.'s shaking hands as a sign of nervousness, particularly where Mr. Debrew Sr. had just handed over what Officer Strain believed to be falsified vehicle documentation.

The Tenth Circuit has previously determined that nervousness and questionable bills of lading contribute to the creation of probable cause. See United States v. Mendivil, 2006 WL 3598301 at *3 (10th Cir. Dec. 12, 2006) (unpublished opinion) (motion to suppress was "without merit" where, among other things, bill of lading appeared suspicious and Border Patrol agent observed truck driver "exhibiting nervous behavior."). An unusually small amount of cargo in a tractor trailer may also contribute to a finding of probable cause. Vasquez-Castillo, 258 F.3d at 1213 (citing United States v. Dominguez-Prieto, 23 F.2d 464, 470 (6th Cir. 1991).

Officer Strain's suspicions only increased once he entered the trailer, which he was unquestionably authorized to do.  See Mitchell, 518 F.3d at 752 ("New Mexico's regulatory scheme clearly contemplates entrance into the trailer to inspect blocking and bracing. . . ."). According to Officer Strain, Mr. Debrew Sr. attempted to climb into the trailer with him, which Officer Strain found unusual, uncommon, and atypical. [See Doc. 105 at 23].  As Officer Strain explained, "while [he is] inside the trailer [he is] gonna be turning [his] back on the driver and—and [the driver] already knows what's inside the trailer, he knows that [Officer Strain is] going in there to inspect that, and he doesn't have any reason to be in there." [Id. at 23-24].

Mr. Debrew Sr. also made a point of calling Officer Strain's attention to the spare tires in the trailer, which Officer Strain found unusual because, while all trailers carry spare tires, Officer Strain has "never had a driver say, 'Hey I've got spare tires towards the back. . . ." [Doc. 105 at 23].  Officer Strain credibly testified that he viewed Mr. Debrew Sr.'s announcement as an attempt to draw his attention to the *back* of the trailer, id., whereas the boxes that Mr. Debrew Sr. was hauling were secured at the *front* of the trailer, see Exh. 4.

Finally, Officer Strain explained that he found it unusual that the boxes in Mr. Debrew Sr.'s trailer were covered with blankets, since, in his experience, "blankets are used to cover up furniture, cabinets, chest[s] of drawers, anything that—that would possibly be scratched or dented or just dinged up." [Id. at 25].  To be sure, when asked during the suppression hearing if he had ever known blankets to be used to separate loads being transported during a multi-load haul, Officer Strain responded, "Not blankets, no." [Id. at 52].

25

Given the totality of the circumstances, even if it could fairly be said (which it cannot) that, prior to entering the trailer, Officer Strain lacked probable cause to believe that criminal activity was afoot, such cause clearly arose once he entered the trailer, as he was authorized to do.  See Vasquez-Castillo, 258 F.3d at 1213 ("[i]t is well established that although probable cause to search a [vehicle] may not exist when [it] is first stopped for a traffic citation, it can arise during the course of the stop.").  Accordingly, Officer Strain's search was valid.  Because "[a] valid search cannot bear 'fruit of the poisonous tree[,]'" United States v. Pham, 17 Fed.Appx. 778, 784 (10th Cir. 2001) (unpublished opinion), Mr. Debrew Sr.'s argument that that doctrine supports the suppression of the firearm that Officer Chavez found in the duffle bag, as well as Mr. Debrew, Sr.'s post-arrest statements, fails.

### 3.    Whether Mr. Debrew Sr.'s Post-Arrest Statement was Voluntary

In addition to arguing that his post-arrest statement should be suppressed as fruit of the poisonous tree, Mr. Debrew Sr. also contends that his statement should be suppressed because it was not voluntarily made.  Instead, he maintains that (1) his statement was "induced or coerced in the sense that the [questioning] officers implied favorable treatment to reduce [Mr. Debrew Sr.'s] jail sentence if [he] would admit guilt; and (2) the officers "impliedly threatened [him] on more than one occasion throughout the interrogation. . . ." [Doc. 35 at 3-4].  I am not persuaded by Mr. Debrew Sr.'s argument.

"An inculpatory statement, to be admissible, must be made voluntarily and of the defendant's free will." United States v. Minard, 2006 WL 3598396, at *2 (10th Cir. Dec. 12, 2006) (citing Colorado v. Connelly, 479 U.S. 157, 167 (1986)).  The Tenth Circuit has held

that "[a] statement is involuntary in violation of due process if 'a defendant's will was overborne by the circumstances surrounding' his confession." United States v. Lamy, 521 F.3d 1257, 1261 (10th Cir. 2008) (quoting Dickerson v. United States, 530 U.S. 428, 434 (2000). Coercive police activity is a necessary predicate to a constitutionally involuntary confession, with the Court's inquiry being whether questioning officers took unfair advantage of the defendant's traits or the surrounding circumstances. Lamy, 521 F.3d at 1261. Factors relevant to this determination include:

> (1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to physical punishment.

Id. at 1262 (citing United States v. Toles, 297 F.3d 959, 966 (10th Cir.2002)). No single factor is determinative; instead, it is another "totality of the circumstances" consideration.

In the Tenth Circuit, "a promise of leniency is relevant to determining whether a confession was involuntary and, depending on the totality of the circumstances, may render a confession coerced." Clanton v. Cooper, 129 F.3d 1147, 1159 (10th Cir. 1997). In United States v. Garot, the Tenth Circuit "flesh[ed] out" the standards relevant to a determination of whether a statement has been obtained by any direct or implied promises, however slight. United States v. Garot, 801 F.2d 1241, 1244 (10th Cir. 1986). The Court asks:

> First, was an express or implied promise of lenience made to [defendant]? Secondly, if no promise of lenience was made, did [defendant] reasonably believe that such a promise had been made? Thirdly, if a promise was made or if [defendant] reasonably believed that a promise had been made, was his

27

> statement induced by that promise in a 'but for' sense? Fourthly, if a promise was made or if [defendant] reasonably believed that a promise had been made, and this promise or belief induced his statement in a 'but for' sense, was the inducing promise coercive?

Id. at 1244-45.

In Garot, the Tenth Circuit answered all four questions in the negative, having concluded that nothing in the questioning officer's statement—that the defendant could be in "big trouble" but if she were to tell the truth, the officer would relay the information to the prosecutor—could be construed as a promise of leniency.  Id. at 1245.

So too in this case.  Here, there was no express promise of leniency, nor does Mr. Debrew Sr. suggest that there was.  Rather, he contends that Officers Watkins and Candelaria "implied favorable treatment" by telling him that they had seen people who cooperate "walk away from this stuff" or do a "little bit of time."

It is true that, throughout their interview with Mr. Debrew Sr., Agents Watkins and Candelaria made such comments as, "If you can help us, we'll do what we can to help you[;]" "You guys are in a bad position[;]" "You gotta be honest[;]" "You gotta give me leverage[;]" "[I]f you know more, you might as well tell me the whole thing[;]" "[I]f you're gonna go in front of the judge and jury and say, I knew this, I knew this, I knew this, I did this, this and this, but I didn't know, man, they're gonna—they're gonna hammer you, I'm telling you right now[;]" "Right now is where—where you get the most value out of that information, the most amount of [federal] points you could possibly get to knock that time down to whatever you can[;]" and "I really wish you'd come clean with something. . . ."

[Debrew Sr. Transcription at 8, 13, 22, 23, 26, 34, 40].

In this case, I conclude that statements through which the agents (1) assessed Mr. Debrew Sr.'s situation; (2) urged him to be truthful; (3) predicted the possible reaction from judge and jury; and (4) vaguely mentioned the federal points system with Mr. Debrew, constitute mere opinions of the questioning agents and not express or implied promises of leniency or anything else.

As for the second factor, courts give weight to the fact that officers caution a defendant that they are making no promises. See United States v. Jacks, 634 F.2d 390, 394 (8th Cir. 1980) (statement was voluntarily made where, among other things, questioning agents "expressly cautioned" defendant that they were making no promises of leniency). In this case, before questioning began, Agent Candelaria advised Mr. Debrew Sr. that "we can't promise you anything, and we're not going to." [Debrew Sr. Transcription at 14]. Additionally, the *Waiver of Rights* form that Agent Watkins read aloud to Mr. Debrew Sr., and that Mr. Debrew Sr. both signed and initialed, expressly states that he is waiving his rights to remain silent and to consult an attorney "without any promise of reward or immunity." [Exh. 9].

In light of the foregoing, I conclude that no express or implied promise of lenience was made to Mr. Debrew Sr., nor would he have been reasonable in believing that such a promise had been made. See Garot, 801 F.2d at 1244-45. Accordingly, I need not reach the third and fourth Garot factors.

Returning now to the Lamy factors that are relevant to a determination whether a

defendant's statement was involuntary, I note that, at the time he was interviewed on November 24, 2008, Mr. Debrew Sr. was 64 years old.  He also had at least some familiarity with the criminal justice system, having previously been convicted and incarcerated for what he described to Agents Watkins and Candelaria as "conspiracy of drug trafficking." [Debrew Sr. Transcription at 7].  A defendant's familiarity with the criminal justice system weighs in favor of finding that he has voluntarily, knowingly, and intelligently waived his right to remain silent.  See United States v. Tucker, 110 F.3d 74 (10th Cir. 1997) (unpublished opinion).

The interview of Mr. Debrew Sr. lasted for 33 minutes, during which time Mr. Debrew Sr. was not handcuffed.  The interview occurred in what Officer Watkins described as "the typical standard office setting" with Officer Watkins behind a desk, Mr. Debrew Sr. on the other side of the desk, and Officer Candelaria next to Mr. Debrew Sr.  Lieutenant Kerr also was present, leaning against a wall.  Officer Watkins testified that while Lieutenant Kerr was in uniform, Officer Watkins and Officer Candelaria were dressed in "typical street clothes, jeans . . . decent shirt, polo, that type of thing." [Doc. 105 at 79].  Neither Officer Watkins nor Agent Candelaria was armed during the interview.  [Id.].

Again, before the questioning began, Mr. Debrew Sr. was advised of his rights under Miranda. [Debrew Sr. Transcription at 4-6].  Having been read his rights, Mr. Debrew Sr. told Agent Watkins that he both understood his rights and had "no trouble" with what was read to him. [Id. at 6].  Mr. Debrew Sr. also signed and initialed a *Border Operations Task Force Advise/Waiver of Rights* form waiving his rights.  [See Exh. 9; Debrew Sr.

30

Transcription at 6]. "A defendant's act of signing a waiver form prior to confession, though not conclusive, is 'usually strong proof' of the voluntariness of the waiver." United States v. Fountain, 776 F.2d 878, 886 (10th Cir. 1985).

Finally, there is no evidence—nor has there been any allegation—that Mr. Debrew Sr. was subjected to physical punishment during the interview. From having reviewed Mr. Debrew Sr.'s recorded interview a number of times, I find that Agents Watkins and Candelaria maintained a professional, cordial, and non-threatening tone throughout. At no point during the interview can the agents be heard to raise their voices. [See Exh. 10]. I also find that Mr. Debrew Sr. comes across as calm, cooperative, and agreeable. He is deliberate and contemplative in his responses and, at various points during the interview, Mr. Debrew Sr. can even be heard laughing or chuckling. [See id.]. In light of all of the circumstances, I conclude that Mr. Debrew Sr. made a voluntary post-arrest statement to Agents Watkins and Candelaria. Mr. Debrew Sr.'s statement will not be suppressed, and his motion will be denied. I now turn to Mr. Debrew Jr.'s motion to suppress.

**B.** **Nathan Debrew Jr.'s *Motion to Suppress Statement and Physical Evidence and Memorandum in Support Thereof* [Doc. 50]**

**1.** **Probable Cause to Arrest Mr. Debrew Jr.**

Mr. Debrew Jr.'s first argument in support of his motion to suppress all physical evidence seized as a result of the events of November 24, 2008 is that Officer Strain lacked probable cause to arrest him. Mr. Debrew Jr. maintains that, while Officer Strain arrested him immediately after finding and cutting into the first package of marijuana, "Officer Strain

had absolutely no facts to link" him to the drugs. [Doc. 50 at 3].

"'[M]ere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause.'"  Poolaw v. Marcantel, 565 F.3d 721, 729 (10th Cir. 2009) (quoting Ybarra v. Illinois, 444 U.S. 85, 91 (1979)).  In Poolaw, the Tenth Circuit, based on a review of several district-court cases, "discern[ed] a clear rule: A familial relationship to someone suspected of criminal activity, without more, does not constitute probable cause to search or arrest."  Poolaw, 565 F.3d at 730.

The "mere propinquity" concept was considered in Ybarra, where police officers obtained a warrant to search a tavern and its bartender for evidence of possession of a controlled substance. Upon entering the tavern, the officers conducted patdown searches of the customers present in the tavern, including Ybarra. Inside a cigarette pack retrieved from Ybarra's pocket, an officer found six tinfoil packets containing heroin. The Supreme Court explained that

> a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.

Ybarra, 444 U.S. at 91.

Notwithstanding the "mere propinquity" rule of Ybarra, where the arrestee is a passenger in a vehicle, arresting officers may develop probable cause of a joint illegal

enterprise absent particularized suspicion.   United States v. Dennison, 410 F.3d 1203, 1211 (10th Cir. 2005) (*citing* Maryland v. Pringle, 540 U.S. 366 (2003)).

In Pringle, an officer stopped a car for speeding at 3:16 a.m.; three occupants were in the vehicle. When the driver opened the glove compartment to retrieve a vehicle registration, the officer saw a large amount of rolled-up money. The driver consented to a search of the car, and officers found $763 in the glove compartment and several bags containing cocaine elsewhere.   Pringle, 540 U.S. at 368.  The three occupants offered no information about ownership of the drugs and money, and the officer arrested all three. The Supreme Court considered it "an entirely reasonable inference" that any or all occupants knew of or had control of the cocaine. Id. at 372.  The Supreme Court went on to distinguish Ybarra because the three Pringle occupants "were in a relatively small automobile, not a public tavern." Id. at 373. Furthermore, "it was reasonable for the officer to infer a common enterprise among the three men," as the quantity of drugs and money suggested a likelihood of drug dealing. Id.  Moreover, "drug dealing [is] an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him."   Id. at 373.

I find that Pringle is distinguishable from the facts of the instant case.  In Pringle, the rolled-up cash was found in the glove compartment, which was  obviously in close proximity to Pringle, the front-seat passenger.  The glove compartment also was where the driver had stored his license and registration.  The drugs were found in the back-seat armrest; one of the defendants was seated in the back seat.  Given those facts, clearly it was reasonable for the arresting officer to believe that the three defendants were engaged in a common enterprise.

By contrast, in this case, the marijuana was found in the trailer portion of the tractor trailer, while Mr. Debrew Jr. occupied the tractor.  The trailer was locked, and it was Mr. Debrew Sr., not Mr. Debrew Jr., who held the key.  It was not possible to access the trailer from the tractor without passing through the locked rear.  It similarly was Mr. Debrew Sr., not Mr. Debrew Jr., who exhibited what Officer Strain interpreted as nervous behavior, and it was Mr. Debrew Sr., not Mr. Debrew Jr., who presented credentials that Officer Strain found questionable.  Mr. Debrew Jr. does not possess a commercial driver's license, and was not serving as Mr. Debrew Sr.'s co-driver.  Finally, until he asked Mr. Debrew Sr. if anyone else was in the tractor, Officer Strain apparently did not even realize that Mr.  Debrew Jr. was present.  Cf. Pringle, 540 U.S. at 371-372 (where (1) defendant was one of three men riding in car at 3:16 a.m; (2) there was $763 of rolled-up cash in the glove compartment directly in front of defendant (3) five plastic baggies of cocaine were behind the back-seat armrest and accessible to all three men; and (4) upon questioning, all three men failed to offer any information with respect to the ownership of the cocaine or the money.).

A more on-point (but still distinguishable case) would be United States v. Baker, 2008 WL 2410850 (S.D.Ill., June 11, 2008).  In Baker, the defendant was arrested after cocaine was recovered from a semi-tractor trailer in which defendant was the co-driver.  Defendant did not contest the lawfulness of the search of the truck; instead, in his motion to suppress, he contended that his arrest was without probable cause because arresting officers did not know who owned the trailer, and did not know the relationship between the two drivers. Baker, 2008 WL 2410850, at *2.

The trial court denied the motion, expressly finding that probable cause existed to arrest defendant where he (1) was in the cab of the trailer in which the drugs were located at the time officers started questioning his co-defendant; (2) had been identified by the co-defendant as a "co-driver" of that tractor-trailer; and (3) was easily able to locate the correct key to open the trailer padlock.  The court explained that "[a]ll of these things [were] particularized to [defendant], and gave the officers probable cause to believe that he was engaged in illegal narcotics trafficking." Baker, 2008 WL 2410850, at *3.

I do not believe that such particularized suspicion exists here, where Mr. Debrew Jr. was not a co-driver of the tractor trailer, and did not even possess a commercial driver's license.   To be sure, Officer Strain described Mr. Debrew Jr. as "an unauthorized passenger. . . ." [Doc.105 at 54].  Although Mr. Debrew Jr. was in the cab of the tractor when the marijuana was found, the marijuana was in the trailer; the trailer was locked; and it was Mr. Debrew Sr. who held the key.  It would not have been possible for Mr. Debrew Jr. to access the trailer without unlocking and entering through the rear door.  Mr. Debrew Jr. was not a co-driver and his presence was not even noticed by Officer Strain until Officer Strain asked Mr. Debrew Sr. if anyone else was in the tractor.  I conclude that Officer Strain lacked particularized suspicion and, therefore, probable cause to arrest Mr. Debrew Jr. Nevertheless, Mr. Debrew Jr. is not entitled to the relief he seeks because the marijuana would inevitably have been discovered even absent the unlawful arrest.

In order to suppress the marijuana as the fruit of his unlawful detention, Mr. Debrew Jr. must demonstrate "'a factual nexus between the illegality and the challenged evidence.'"

35

United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000) (*quoting* United States v. Kandik, 633 F.2d 1334, 1335 (9th Cir.1980)).  In other words, he must show that the marijuana would not have come to light but for the government's unconstitutional conduct. See United States v. Albert, 579 F.3d 1188, 1197 (10th Cir. 2009). Were Mr. Debrew Jr. to make this showing, the burden would then shift to the government to "prove that the evidence sought to be suppressed is not 'fruit of the poisonous tree,' either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." Id.

In this case, even absent the unlawful arrest, Officer Strain would have discovered the marijuana during his cause-based search of Mr. Debrew Sr.'s trailer.  As explained more fully above, at the time Officer Strain cut into the box and discovered the marijuana, ample probable cause particularized to Mr. Debrew Sr. supported Officer Strain's actions.  There is no evidence that but for the illegal arrest of Mr. Debrew Jr., Officer Strain would not have found the marijuana.  To be sure, the marijuana was discovered *not* because Mr. Debrew Jr. was unlawfully arrested but, instead, because, given the totality of the circumstances, Officer Strain developed a particularized and objective basis for suspecting that criminal activity was afoot.  Because the marijuana was not discovered as a result of Mr. Debrew Jr.'s unlawful arrest, it will not be suppressed.

**2.**      **Whether Cutting Open the Box Worked a Violation
of Mr. Debrew Jr.'s Fourth Amendment Rights**

Mr. Debrew Jr. next argues that Officer Strain's opening of the box in which the initial bundle of marijuana was found was a violation of Mr. Debrew Jr.'s Fourth Amendment right because Officer Strain lacked probable cause to search.  This argument fails for the same reason it failed with respect to Mr. Debrew Sr.—probable cause existed to support Officer Strain's search.[4]

## III. CONCLUSION

For the foregoing reasons, Defendant Nathan Debrew Sr.'s *Motion to Suppress*, and Defendant Nathan Debrew Jr.'s *Motion to Suppress Statement and Physical Evidence and Memorandum in Support Thereof* are denied.

**IT IS, THEREFORE, ORDERED** that Nathan Debrew Sr.'s *Motion to Suppress* [Doc. 35], is **DENIED**;

---

[4]  It is questionable whether Mr. Debrew Jr., as a passenger, has standing to challenge directly the search of the trailer.

"'[W]ithout a possessory or property interest in the vehicle searched, 'passengers lack standing to challenge vehicle searches.'" United States v. DeLuca, 269 F.3d 1128, 1132 (10th Cir. 2001) (*quoting* United States v. Eylicio-Montoya, 70 F.3d 1158, 1161, 1162 (10th Cir.1995)). Indeed, in his written closing argument, Mr. Debrew Jr. appears to concede that he lacks standing to mount a direct challenge to the search of the trailer. [See Doc. 119 at 1 ("Although a defendant [may] lack the requisite possessory or ownership interest in a vehicle to directly challenge a search of the vehicle, the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the defendant's illegal detention.")].

In this case, probable cause supported Officer Strain's search.  Accordingly, even if it could be said that Mr. Debrew Jr. has standing to attack directly the search of the trailer, he would not prevail.

**IT IS FURTHER ORDERED** that Nathan Debrew Jr.'s *Motion to Suppress Statement and Physical Evidence and Memorandum in Support Thereof* [Doc. 50] is **DENIED**.

**SO ORDERED** this 31st day of December, 2009, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge

38