# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

       Plaintiff,

    vs.                          No. CR 09-2054 MCA

**NATHAN DAVID DEBREW, JR.,**

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendant Nathan David Debrew, Jr.'s *Motion for a Judgment of Acquittal*, made orally on January 27, 2010 pursuant to Rule 29 of the Federal Rules of Criminal Procedure and renewed on January 28, 2010, [Doc. 171], and *Defendant Debrew Jr.'s Motion in the Alternative for New Trial Pursuant to Federal Rule of Criminal Procedure 33* [Doc. 172], filed February 4, 2010. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants Mr. Debrew, Jr.'s motion for a judgment of acquittal and conditionally grants his motion for a new trial.

## I. BACKGROUND

The events leading up to the filing of the *Indictment* and the *Superseding Indictment* in this case are set out more fully in the Court's December 31, 2009 *Memorandum Opinion and Order* [Doc. 131] denying the defendants' suppression motions, and which statement of

events is incorporated herein by reference.  Events described herein are necessary for resolution of the motions currently before the Court.

On July 29, 2009, the Grand Jury returned an *Indictment* charging the defendants, Nathan David Debrew, Sr. ("Mr. Debrew, Sr." or "Debrew, Sr.") and Nathan David Debrew, Jr. ("Mr. Debrew, Jr." or "Debrew, Jr."), Mr. Debrew Sr.'s son, with conspiracy to possess with intent to distribute 100 kilograms and more of marijuana (Count I); and possession with intent to distribute 100 kilograms and more of marijuana (Count II). [Doc. 30].  Only Mr. Debrew, Sr. was charged in Counts III and IV of the Indictment.  Both defendants pled not guilty. [See Docs. 67, 75].

A jury trial was convened on January 25, 2010.  At the close of the government's case-in-chief, counsel for Mr. Debrew, Jr. moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, on the ground that the evidence was insufficient to sustain a verdict of guilty against Mr. Debrew, Jr. as to either Count I or Count II of the *Superseding Indictment*.  The Court reserved its ruling at that time and took the matter under advisement.  Neither defendant presented evidence and the Court instructed the jury.  The jury returned a guilty verdict against Mr. Debrew, Jr. with respect to both Count I and Count II.  [Doc. 166].  Counsel for Mr. Debrew, Jr. then renewed her motion for a judgment of acquittal, and the Court ordered simultaneous briefing on the issue.

## II. ANALYSIS

### A.      Federal Rule of Criminal Procedure 29

Rule 29 of the Federal Rules of Criminal Procedure provides, in pertinent part, that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed.R.Crim.P. 29(a).  In this case, counsel for Mr. Debrew, Jr. moved for a judgment of acquittal at the close of the government's case, which also was the close of the evidence.  The Court reserved ruling on the motion.  Rule 29 also provides that

> [t]he court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

Fed.R.Crim.P. 29(b).

In considering a motion for a judgment of acquittal, the Court views the evidence in a light most favorable to the government, asking whether all of the evidence, both direct and circumstantial, together with the reasonable inferences to be drawn therefrom, would allow a rational fact-finder to find the defendant guilty of the crime charged beyond a reasonable doubt. *United States v. Burkley*, 513 F.3d 1183, 1188 (10th Cir. 2008). The Court may not "inquire into the jury's credibility determinations or its conclusions regarding the weight of the evidence." *United States v. Kaufman*, 546 F.3d 1242, 1263 (10th Cir. 2008). Although

the evidence supporting the conviction must be substantial and do more than just raise a mere suspicion of guilt, "it 'need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt.'" *United States v. Johnson*, 42 F.3d 1312, 1319 (10th Cir. 1994) (quoting *United States v. Alonso*, 790 F.2d 1489, 1493 (10th Cir.1986)). In determining whether the government has adduced sufficient evidence to permit a reasonable jury to return a verdict in the government's favor, the Court must consider the applicable burden of proof, *see Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 252-53 (1986), which in the present case, a criminal prosecution, requires the government to prove its case beyond a reasonable doubt. To support a conviction under a beyond a reasonable doubt standard, the evidence and inferences drawn from the evidence must be sufficiently compelling that a hypothetical reasonable factfinder could have reached "a subjective state of near certitude of the guilt of the accused." *Jackson v. Virginia*, 443 U.S. 307, 315 (1979).

While the jury, as fact-finder, retains discretion to resolve all conflicting testimony, weigh the evidence, and draw reasonable inferences from the basic facts to the ultimate facts, a conviction cannot stand if it is "obtained by piling inference upon inference." *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998) (quoting *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995)) ("*Jones I*"). An inference "must be more than speculation and conjecture to be reasonable[;] an inference is reasonable only if the conclusion flows from logical and probabilistic reasoning." *Jones I*, 44 F.3d at 865.

4

**1.  Evidence Presented at Trial**

Viewed in the light most favorable to the government, the evidence set presented at trial was sufficient to establish the following facts. On November 24, 2008, Mr. Debrew, Jr. was a passenger in a commercial motor vehicle being driven by his father and co-defendant, Nathan Debrew, Sr., when the vehicle was stopped at the Lordsburg, New Mexico Motor Transportation Division ("MTD") Port of Entry.  MTD Officers James Tarango and Ben Strain greeted Mr. Debrew, Sr. and on the basis of Mr. Debrew, Sr.'s nervous demeanor, questionable route of travel, and apparently falsified log book presented by Mr. Debrew Sr., decided to conduct a Level II inspection.  At the time this decision was made, neither Officer Tarango nor Officer Strain was aware that Mr. Debrew, Jr. was in the vehicle's sleeping compartment.  No co-driver was listed on Mr. Debrew, Sr.'s paperwork.

Mr. Debrew, Sr. explained to the officers that he was transporting a load of military-household items from the west coast to the east coast.  With this, Officer Strain became suspicious, because from his seven years' experience with the MTD, he knew that military moves are professional moves that are accompanied by a great deal of paperwork.  However, he observed that that was not the case here.  Officer Strain then began his walk-around inspection of Mr. Debrew, Sr.'s tractor trailer.

After the exterior inspection, Officer Strain asked Mr. Debrew, Sr. to unlock the trailer's rear doors so that Officer Strain could conduct a cargo verification.  Mr. Debrew, Sr. took out his keys and complied.  Mr. Debrew Sr. had possession and custody of the keys to

the trailer.  After the cargo verification developed into a lawful search,[1] Officer Strain discovered seven brown U-haul moving boxes, of various sizes, pushed to the front of the trailer and partially covered with a moving blanket.  After cutting into the boxes, Officer Strain discovered that they contained a green leafy substance that tested positive for marijuana.  Officer Strain arrested Mr. Debrew, Sr., handcuffed him, and read him his *Miranda* rights.  Shortly thereafter, the officers learned that Mr. Debrew, Jr. also was in the vehicle, inside the sleeping compartment.

Officer Strain then approached the tractor trailer and knocked three times on the door very loudly.  Officer Strain testified that within approximately one minute, Mr. Debrew, Jr. opened the door and Officer Strain, his weapon drawn and pointing at Mr. Debrew, Jr., ordered him out of the vehicle.  Mr. Debrew, Jr., who was not wearing shoes at that point, sat down, put his shoes on, and climbed down from the tractor.  Officer Strain then ordered Mr. Debrew, Jr. to the ground, handcuffed him, and read him his *Miranda* rights.  According to Officer Strain, Mr. Debrew, Jr.'s demeanor conveyed to him the message that "I've been caught."

Officer Strain testified that he is familiar with federal trucking regulations, and that Mr. Debrew, Jr. was not authorized to be riding as a passenger in the tractor trailer. According to Officer Strain, it is a violation of federal trucking regulations to have an unauthorized passenger on board a commercial motor vehicle, and unauthorized passengers

---

[1] [See Doc. 131 at 36 (explaining that Officer Strain conducted a cause-based search of Mr. Debrew, Sr.'s vehicle)].

are subject to removal.  However, Officer Strain also testified that it is not uncommon for long-haul truckers to bring along family members or children to accompany them on long trips.

Inside the trailer, in addition to the previously described U-haul boxes, MTD officers also discovered two duffle bags, both of which contained "hygiene stuff [and] personal clothing."  One of the bags also contained a semi-automatic handgun, a holster, and ammunition.  Officer Benjamin Chavez, the MTD inspector who actually opened the bags, testified that there was no identification or name tags on the bags, and he did not know to whom either bag belonged.  Five cell phones also were removed from the tractor trailer.

Both Debrews made post-arrest statements.  With respect to Mr. Debrew, Sr.'s statement, the evidence at trial revealed that Mr. Debrew, Sr. worked for Cook's Moving Company, and had been so employed since February of 2005, when he was released from prison after having been incarcerated on a drug-trafficking conspiracy charge.  Mr. Debrew, Sr. had been living in New York when he was charged.

As for the marijuana discovered on November 24, 2008, Mr. Debrew, Sr. explained that he had picked up seven boxes on a Tucson, Arizona street from an unidentified Hispanic man.  The unidentified man loaded the boxes onto the back of the trailer, and Mr. Debrew, Sr. pushed them to the front. Mr. Debrew, Sr. denied knowing that there were drugs in the boxes, but admitted that he suspected illegal activity was afoot.  Mr. Debrew, Sr. explained that he was to deliver the boxes to Detroit, and that he hoped to earn some money as a result.

As for Mr. Debrew, Jr. the trial evidence revealed that in his post-arrest statement

he stated "This ain't fair.  I was—this guy set me up man. . . this ain't fair.  Okay?" [See Exh. 14a].

Drug Enforcement Administration  Special Agent Darren Rhoden was the case agent in this matter.  He became involved after receiving a telephone call about the Debrews from the New Mexico State Police.  SA Rhoden interviewed both Nathan Debrew, Sr. and Nathan Debrew, Jr.  SA Rhoden's testimony confirmed what Mr. Debrew, Sr. had said—that he and the unidentified Hispanic man had loaded the boxes into the trailer.

According to SA Rhoden, Mr. Debrew, Jr. revealed that he was married and was unemployed.  SA Rhoden testified that, of the five cell phones recovered from the tractor trailer, Mr. Debrew, Jr. was the subscriber to three of them.  Further investigation into the cell phones, however, failed to reveal a connection to any past or present drug-trafficking investigation.  SA Rhoden's investigation also revealed that Mr. Debrew, Sr. had a criminal history, while Mr. Debrew, Jr. had none.

After he was qualified as an expert in the area of drug trafficking, SA Rhoden testified as to the different roles played by different people involved in drug trafficking.  Among other things, he explained that (1) drug trafficking is a cash business; (2) individuals involved in trafficking generally do not know other individuals' identities; and (3) the value of marijuana increases as it moves farther north of the United States/Mexico border, because the associated risks also grow.  SA Rhoden testified that the 586 pounds of marijuana seized in this case was consistent with an amount intended for distribution, rather than personal use,

and that its value in Lordsburg, New Mexico was $313,500, while its value "farther north into the interior United States" was approximately $750,000.

SA Rhoden also testified that guns and multiple cell phones are tools of the drug trade, and that drug distributors do not entrust large quantities of drugs to unwitting transporters because of the high risk that those transporters will discover the drugs and inform the authorities. For this same reason, explained SA Rhoden, people who knowingly transport drugs do not invite unwitting passengers along with them to pick up and deliver drugs.

Further expert testimony was elicited from MTD Officer James Smid, who explained that the route the Debrews were traveling when they were apprehended was not the most direct route to take from their point of origin (California) to their destination (Virginia). He also testified that it was notable that the Debrews sat for three days (November 21-23, 2008) in Ontario, California because "time is money" in the trucking business and drivers incur costs when their trucks sit idle.

### B.    Standards

#### 1.    Conspiracy (21 U.S.C. § 846)

Count I of the *Superseding Indictment* in this case charged a conspiracy to possess with intent to distribute a large quantity of marijuana:

> On or about November 24, 2008, in Hidalgo County, in the District of New Mexico and elsewhere, the defendants, **NATHAN DAVID DEBREW, SR.** and **NATHAN DAVID DEBREW, JR.**, did unlawfully, knowingly and intentionally combine, conspire, confederate and agree with each other and with other persons whose names are known and unknown to the Grand Jury to commit the following offense against the United

States, to wit: possession with intent to distribute 100 kilograms and more of a mixture and substance containing a detectable amount of marijuana, contrary to 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).

In violation of 21 U.S.C. § 846.

[Doc. 55 at 1].

To prove a conspiracy in violation of 21 U.S.C. § 846, the government must prove four elements: that (1) the defendant and at least on other person agreed to commit an offense defined in Subchapter 13 of Title 18 of the United States Code; (2) the defendant had knowledge of the essential objectives of the conspiracy; (3) the defendant knowingly and voluntarily became a part of the conspiracy; and (4) the coconspirators were interdependent. *United States v. McCullough*, 457 F.3d 1150, 1159 (10th Cir. 2006).

The essence of a drug-distribution conspiracy is an agreement between two or more persons to traffic in controlled substances. A defendant's participation in a drug-distribution conspiracy is proven by evidence tending to show that the defendant shared a common purpose or design with his alleged coconspirators. *United States v. Horn*, 946 F.2d 738, 740 (10th Cir. 1991). The agreement need not be express, and may in fact "be inferred from the facts and circumstances of the case." *United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992). However, "mere presence, as a passenger, in a car found to be carrying drugs is insufficient to implicate the passenger in the conspiracy[,] [just as] mere association with conspirators does not support a conspiracy conviction." *Jones I*, 44 F.3d at 865.

While the conduct of the alleged co-conspirators may be diverse and far-ranging, it must nevertheless exhibit an interdependence, as it is the interdependence that "serves as a basis for imputing knowledge of the larger plan to peripheral participants and ties all of them together in one scheme." *United States v. Daily*, 921 F.2d 994, 1007 (10th Cir. 1990) (internal quotations omitted), *overruled on other grounds by* 102 F.3d 1043 (1996). Accordingly, interdependence is present if "the activities of a defendant charged with conspiracy facilitated the endeavors of other alleged coconspirators or facilitated the venture as a whole. . . ." *Horn*, 946 F.2d at 741.  For the element of interdependence to be satisfied, it is necessary that "each alleged coconspirator . . . depend on the successful operation of each 'link' in the chain to achieve the common goal." *United States v. Dickey*, 736 F.2d 571, 582 (10th Cir. 2004).

Circumstantial evidence alone is sufficient to demonstrate interdependence and is often the only evidence available to the government. *Caldwell*, 589 F.3d at 1329.  Moreover, a single act also can be sufficient to demonstrate interdependence. *Id.*  However, when a defendant's connection to a conspiracy is slight, "that slight connection must be proven with evidence to establish knowing participation beyond a reasonable doubt." *Horn*, 946 F.2d at 741.  Thus, those without knowledge of the conspiracy are not conspirators, just as one does not become a member of the conspiracy "merely by associating with conspirators known to be involved in crime." *Id.*  "[B]ecause guilt is always dependent on personal and individual conduct, not on mere association or unknowing involvement[,] [ courts ] are mindful to guard against the mass application of guilt when conspiracy charges are involved. . . ." *Id.*

### a.    Conspiracy: The Evidence Against Mr. Debrew, Jr.

The government argues that, from Mr. Debrew, Jr.'s post-arrest statement that "this guy set me up," the jury could reasonably have inferred the existence of an agreement between the Debrews and an unknown co-conspirator to traffic marijuana.  [Doc. 170 at 13]. The government also notes that after they made their last legitimate delivery of furniture, the Debrews "high-tailed it straight to the border" instead of heading back to the east coast. According to the government, this "strongly suggests that there was an agreement involving Debrew, Jr. to pick up marijuana along the border and to take it further into the United States." [*Id.* at 14].  The government posits that this inference is made even stronger in light of Officer Smid's testimony that, in the trucking business, "time is money," and that truckers incur costs when their vehicles sit idle. [*Id.*].

The government additionally argues that because the Debrews were together during the entire westbound trip and because of their relationship as father and son, "it stands to reason that Debrew, Jr. was present when the boxes of marijuana were loaded into the trailer." [Doc. 170 at 14].  Moreover, maintains the government,

> [h]aving just spent approximately two weeks with his father delivering six military household loads,  Debrew, Jr. obviously was aware of the highly professional nature of such a move, something markedly different than what must have transpired whenever the boxes of marijuana were loaded into the trailer—evidenced by the fraudulent bill of lading that accompanied the marijuana. This of course, suggests that Debrew, Jr. was involved in an agreement to transport the marijuana.

[*Id.* at 15].

Another inference that the jury could reasonably have drawn, contends the government, is that Mr. Debrew, Jr. must have been a knowing and willing participant in a drug-distribution conspiracy, since, as SA Rhoden testified, drug traffickers do not entrust unwitting couriers to transport bulk marijuana because of the attendant risks, and, for the same reason, drug couriers do not invite unknowing, innocent passengers to travel with them. The government maintains that this inference is even stronger where, as here, courier and passenger are father and son. [Doc. 170 at 15].

When the government depends upon inferences to carry its burden of proof, those inferences must be reasonable and probative ones, and amount to more than just speculation and conjecture. As our Tenth Circuit has explained, "'[a] jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility. Such a finding is infirm because it is not based on the evidence.'" *United States v. Jones*, 49 F.3d 628, 632 (10th Cir. 1995) ("*Jones II*") (quoting *Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 521 (10th Cir.1987)). While it is not always easy to distinguish between a reasonable inference and mere speculation, the Tenth Circuit approaches the issue by recognizing that

> [t]he line between a reasonable inference that may permissibly be drawn by a jury from basic facts in evidence and an impermissible speculation is not drawn by judicial idiosyncrasies. The line is drawn by the laws of logic. If there is an experience of logical probability that an ultimate fact will follow from a stated narrative or historical fact, then the jury is given the opportunity to draw a conclusion because there is a reasonable probability that the conclusion flows from the proven facts.

*Jones II*, 49 F.3d at 632 (quoting *Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879, 895 (3d Cir.), *cert. den.*, 454 U.S. 893, 102 S.Ct. 390 (1981)).  Thus, even though rational jurors may suspect that a defendant is guilty, they may not convict on that *suspicion* alone, as that would be tantamount to "permit[ting] speculation to substitute for proof beyond a reasonable doubt."  *Jones II*, 49 F.3d at 632-633.  An inference is neither reasonable nor probabilistic if it is drawn as a result of "pil[ing] one inference upon another."  *See id.* at 633.

In this case, to the extent the government argues that reasonable inferences about Mr. Debrew, Jr.'s involvement in a drug-distribution conspiracy may be drawn from evidence concerning Jr.'s familiarity with military moves and/or knowledge of the commercial trucking industry, I conclude that such inferences are reached only by "pil[ing] one inference upon another."  *Jones II*, 49 F.3d at 633.  For example, the government notes that Mr. Debrew, Jr. was traveling with his father for the purpose of making six deliveries of household goods, the last of which was to be made in Sacramento, California.  According to the government,

> [t]he fact that after the Defendants made the final, legitimate delivery in Sacramento, California on November 20, and then high-tailed it straight to the border, staying three nights in Ontario, California, strongly suggests that there was an agreement involving Debrew, Jr. to pick up marijuana along the border and to take it further into the United States.

[Doc. 170 at 14].  The government then insists that "[t]his inference is made stronger in light of Officer Smid's testimony that in the trucking industry 'time is money' and that truckers incur costs even when idling. . . ." [*Id.*].

14

The problem with asking the jury to draw these inferences and apply them to Mr. Debrew Jr., however, is that, at least with respect to Mr. Debrew, *Jr.*, such inferences do not logically flow from the evidence adduced at trial.  In other words, these inferences could reasonably be drawn only if the evidence had demonstrated that Debrew, Jr. understood or had knowledge of the commercial trucking industry and the mechanics of military moves. But no such evidence was presented and the government's proffer rests solely on the familial relationship of father/son.  Instead, the evidence demonstrated that Debrew, Jr. assisted his father with a number of military moves, and that Debrew, Sr. was an experienced truck driver, as well as Cook's best driver.  From this evidence, the government contends that "it's a reasonable inference that a son would know what his father does for a living."  Even so, it is *not* reasonable nor is it logical to infer that Debrew, Jr. consequently "obviously was aware of the highly professional nature of such a [military] move," or that Debrew, Jr., who, unlike his father, did not possess a commercial driver's license, would have recognized what the government has called Debrew, Sr.'s "off route of travel," or understood the intricacies of log book record keeping or that Debrew, Sr. had falsified his paperwork. [Doc. 170 at 15]. For these reasons, the conclusion that the government asks be drawn (*i.e.*, that "[t]his of course, suggests that Debrew, Jr. was involved in an agreement to transport the marijuana" [*id.*]), do not flow from the facts proven at trial.  *See Jones II*, 49 F.3d at 632.

The government then argues that further evidence tending to prove Mr. Debrew, Jr.'s involvement in a drug-distribution conspiracy can be found in SA Rhoden's testimony that "drug traffickers do not entrust unwitting couriers to transport bulk marijuana because of the

15

attendant risks, and that drug couriers do not invite unknowing, innocent passengers to travel with them for the same reasons." [Doc. 170 at 15].  Viewing the evidence in a light most favorable to the government, "the inference that other co-conspirators must have trusted the defendant d[oes] not support a holding that the defendant knew drugs were involved." *United States v. Boria*, 592 F.3d 476, 482 (3rd Cir. 2010) (citing *United States v. Wexler*, 838 F.2d 88, 91-92 (3rd Cir. 1988)).  To be sure, "[t]he essence of a drug distribution conspiracy is an agreement between two or more persons to traffic in *controlled substances*.'"  *United States v. Hamilton*, 587 F.3d 1199, 1206 (10th Cir. 2009) (quoting *Horn*, 946 F.2d at 740) (emphasis added).  Accordingly, to prove such a conspiracy, the government must show, among other things, that "two or more persons agreed to violate the *drug laws*. . . ." *Hamilton*, 587 F.3d at 1206 (emphasis added).  In this case, the jurors were expressly instructed that before they could find either Debrew guilty of the crime of conspiracy, they had to be convinced that the government had shown beyond a reasonable doubt that, *inter alia*, "two or more persons agreed to violate the *federal drug laws*. . . ." [Doc. 153 at 8 (emphasis added)].

In *Wexler*, the Third Circuit reversed convictions for conspiracy and aiding and abetting the possession and/or distribution of hashish where the defendant served as a lookout for a drug transaction, but the evidence was insufficient to allow the inference that he knew drugs were involved.  *Wexler*, 838 F.2d at 91.  In that case, Robert Wexler was observed in a white Ford sedan conducting what appeared to be counter-surveillance activities.  However, the hashish in question was secreted in crates in a rented Ryder truck

16

that Wexler neither drove nor loaded; in addition to apparently signaling its driver, at most Wexler "stopped by [the Ryder truck] momentarily." *Id.* at 90.  While the Third Circuit concluded that there was

> ample circumstantial evidence . . . from which the jury could have concluded that Wexler was involved in a conspiracy with [his] co-defendants[, . . .] and that the conspiracy involved movement of the cargo of the truck . . . [w]hat [was] missing [was] any evidence that Wexler knew that a controlled substance was couched behind the doors of the Ryder truck.  That knowledge [was] an essential element of the conspiracy charged. Without it the conviction must fail.

*Id.* at 91.

The Third Circuit also accepted that it was likely that Wexler's co-defendants would not have allowed him to participate in the scheme unless they believed he would not report them to the police, and that it also was "more likely than not that Wexler suspected, if not actually knew, that *some form of contraband* was involved in the elaborate secretive arrangements for transport in which he participated." *Wexler*, 838 F.2d at 92 (emphasis added).  Nevertheless, these "permissible inferences d[id] not support a holding that the government met its burden to prove beyond a reasonable doubt that Wexler *knew this was a conspiracy to transport hashish or even another controlled substance*." *Id.* (emphasis added).  Instead, what was missing was "the totality of evidence" from which a reasonable jury could draw logical inferences that Wexler knew the object of the conspiracy. *Id.*

The problem with asking the jury to draw these inferences and apply them to Mr. Debrew Jr., however, is that, at least with respect to Mr. Debrew, *Jr.*, such inferences do not logically flow from predicate facts proved at trial.  In other words, these inferences could

reasonably be drawn only if the evidence had demonstrated that Mr. Debrew, Jr. understood or had knowledge of the commercial trucking industry and the mechanics of military moves. But no such evidence was presented and the government's proffer rests solely on the familial relationship of father/son.  The evidence demonstrated that Mr. Debrew, Jr. assisted  his father with a number of military moves, and that Debrew, Sr. was an experienced truck driver, as well as Cook's best driver.  From this evidence, the government contends that "it's a reasonable inference that a son would know what his father does for a living."  Even so, it is *not* reasonable nor is it logical to infer that Jr. consequently "obviously was aware of the highly professional nature of such a [military] move," or that Debrew, Jr., who, unlike Debrew, Sr., did not possess a commercial driver's license, would have recognized what the government has called Sr.'s "off route of travel," or understood the intricacies of log book record keeping or that Debrew, Sr. had falsified his paperwork. [Doc. 170 at 15].  Further, the government does not point to any evidence that Debrew, Jr., a passenger in a vehicle operated by his father,  had any voice in the decision to layover in California or to return home by a southern route.   For these reasons, the conclusion that the government asks be drawn (*i.e.*, that "[t]his of course, suggests that Debrew, Jr. was involved in an agreement to transport the marijuana" [*id.*]), do not flow from the facts proven at trial.  *See Jones II*, 49 F.3d at 632.

The government then argues that further evidence tending to prove Jr.'s involvement in a drug-distribution conspiracy can be found in SA Rhoden's testimony that "drug traffickers do not entrust unwitting couriers to transport bulk marijuana because of the

attendant risks, and that drug couriers do not invite unknowing, innocent passengers to travel with them for the same reasons." [Doc. 170 at 15].   If Mr. Debrew, Sr.'s statement is credited, the government's evidence tended to prove that the drugs were entrusted to Debrew, *Sr.*   Apart from Mr.  Debrew, Sr.'s statement there was no evidence regarding who was present when  the boxes containing the drugs were loaded into the trailer.

In *United States v. Riggins*,  15 F.3d 992  (10th Cir. 1994), our Court of Appeals reversed a defendant's conviction for conspiring to possess cocaine with the intent to distribute. In *Riggins*, the defendant was riding in a van with her mother, her sister, and her young niece.  The van was stopped for a speeding violation.  A search of the van uncovered large quantities of cocaine.  The Court of appeals held that the government had failed to come forward with sufficient evidence to prove the defendant's involvement in a conspiracy:

> Upon review of the record, we find a striking lack of evidence against [defendant].  To prove its case against [defendant], the government merely showed that she was in the van when Trooper Smith found the drugs, and that in the years prior to her arrest she had received some funds and an automobile from her mother who had previously been arrested for drug activity.  Viewing this evidence in the light most favorable to the government, a reasonable jury could infer that [defendant] knew her mother and sister were involved in drug activity.  *Even if the jury inferred that [defendant] knew her mother and sister were hiding drugs in the van, that evidence is not sufficient to establish that [defendant] knowingly and voluntarily became part of the conspiracy.*

15 F.3d at 994 (emphasis added).

In a case  factually analogous to the one at bar, the Third Circuit Court of Appeals reversed a conviction for conspiracy to possess with intent to distribute marijuana where the evidence against the defendant supported—at most—inferences that he rode in a Ryder truck

from Colorado to Pennsylvania with one of his co-defendants, and that he shared a motel room with that co-defendant. *United States v. Cooper*, 567 F.2d 252, 254 (3rd Cir. 1977). What the evidence was *not* sufficient to establish, however, was that Richard Cooper knew what was in the padlocked rear compartment of the Ryder truck, or that he discussed any illegal plans in telephone calls made from the motel to his residence. *Id.* There was no evidence concerning the identity of the participants in three telephone calls made to Cooper's home in the week before the Ryder truck left Colorado, nor was there any evidence that Cooper made the calls to his home phone from the motel room he shared with his co-defendant. *Id.* There similarly was no evidence that Cooper had access to the padlocked rear compartment of the Ryder truck, or to the key to that compartment, which key was found in Cooper's co-defendant's jacket pocket following a search of the truck. Instead, explained the Third Circuit Court of Appeals,

> [t]he fact that [Cooper] rode in the truck and shared rooms with [a co-defendant] is consistent with a purpose of obtaining inexpensive transportation by sharing driving and expenses. In the absence of some evidence that he knew of the contents of the locked compartment or some evidence that he engaged in telephone or other communication of a conspiratorial nature, no factfinder could find beyond a reasonable doubt that Cooper was a member of the . . . conspiracy. The available evidence is perfectly consistent with innocence. There is no evidence suggesting guilty knowledge or participation. One may not be convicted of conspiracy solely for keeping bad company. The trial court should have entered a judgment of acquittal for Cooper on the conspiracy charge.

*Id.*

In this case, the evidence showed that Mr. Debrew, Sr. was the owner of the tractor trailer that was stopped in Lordsburg on November 24, 2008, having purchased it from his

20

employer, Harold Cook, through an independent-contractor agreement.    The evidence showed that Debrew, Sr. was driving the truck when it was stopped, and that Debrew,  Sr. had completed the accompanying, falsified paperwork.  There was no evidence presented that Debrew, Jr. possessed a commercial driver's license, or served as a co-driver for his father.  To the contrary, during his post-arrest statement, Mr. Debrew, Jr. told interviewing officers that he had a "regular" driver's license issued by the State of North Carolina.  Mr. Debrew, Jr., who was unemployed at the relevant time, also explained in his statement that "he was just riding along to help his father move furniture." [Doc. 170 at 7].  Harold Cook testified that having Debrew, Jr. along to assist would have saved Debrew, Sr. in labor costs.

The evidence revealed that when Officer Tarango requested access to the locked trailer, Mr. Debrew, Sr. produced the key and opened the trailer doors.  Inside the trailer were boxes that the evidence revealed had been loaded by Mr. Debrew, Sr. and an unidentified Hispanic man on a Tucson street.  There was no evidence presented that Jr. assisted in the loading of the boxes, or that he was even present.  There was no evidence presented that Debrew, Jr. was ever in the trailer.  There was no evidence presented that Debrew,  Jr., who did not own the vehicle or serve as a co-driver, had access to the trailer.

The government insists that, from Mr. Debrew, Jr.'s statement that "this guy set me up," the jury could have drawn the reasonable inference that the Debrews  and "an unknown coconspirator" had made an agreement to traffic marijuana. [Doc. 170 at 13].   The government posits that Debrew, Jr. must have been referring to an unknown coconspirator because Debrew, Jr. would not have referred to his father as "this guy." [*Id.* at 15].  However,

viewing the evidence in the light most favorable to the government, Debrew, Jr.'s statement might support a reasonable inference that "this guy" referred to the unidentified Hispanic male described by Debrew, Sr, and it might support the inference that Debrew, Jr. had made *some* sort of arrangement with this individual, but it does not support a reasonable inference that Debrew, Jr. agreed with this individual to transport drugs, as opposed to some other form of contraband. In other words, the evidence does not support a reasonable inference that Mr. Debrew, Jr. knew the object of the conspiracy, *i.e.*, the transporting of drugs. *See Wexler*, 838 F.2d at 92.[2]

SA Rhoden testified that he conducted an investigation of the five cell phones discovered in the vehicle, three of which listed Debrew, Jr. as the subscriber. SA Rhoden ran the phone numbers assigned to these phones through a database designed to detect a link between the phones and other DEA investigations. The information returned was that the numbers were not connected to other drug-trafficking investigations. While SA Rhoden testified that he did not attach much significance to this fact because "it's not uncommon for—for newfound phone numbers to not yet exist in—in other DEA investigations[,]" he

---

[2] In *Wexler*, the Third Circuit carefully distinguished between likely knowledge of illegal activity, and knowledge of the object of a drug-trafficking conspiracy. The court said:

> It is . . . more likely than not that Wexler suspected, if not actually knew, that some form of contraband was involved in the elaborate secretive arrangements for transport in which he participated. *But these permissible inferences do not support a holding that the government met its burden to prove beyond a reasonable doubt that Wexler knew this was a conspiracy to transport hashish or even another controlled substance.* The evidence is just as consistent, for example, with a conspiracy to transport stolen goods, an entirely different crime.

*Wexler*, 838 F.2d at 92 (emphasis added).

also testified that (1) it is not unusual for an individual to own more than one cell phone; (2) he could not recall if all three phones subscribed by Mr. Debrew, Jr. were activated; (3) he could not remember if one of the phones was still in its box; and (4) he could not recall whether a forensic examination of the cell phones revealed that they had been used to call numbers in Arizona.

The government also suggests that the fact that the Debrews are father and son allows for the inference that Mr. Debrew, Jr. must have been a knowing conspirator because "it defies logic that a father who has already been convicted once of drug trafficking and spent eleven years in custody would subject his innocent son to like consequences." [Doc. 170 at 15]. Again, however, such a conclusion does not flow from the *proven* facts, as there was no testimony or evidence presented at trial tending to describe, explain, or cast any light on the nature of this particular father-son relationship. "Familial relationships alone will not support a conspiracy conviction[,] [although] '[i]nferences drawn from familial relationships or mere knowing presence . . . may be combined with other circumstantial evidence to support a conspiracy conviction.'" *United States v. Burton*, 126 F.3d 666, 670 (5th Cir. 1997) (quoting *United States v. Broussard*, 80 F.3d 1025, 1031 (5th Cir. 1996)).

Given the evidence presented at trial, even when viewed in the light most favorable to the government, no reasonable jury could have inferred with the degree of certitude required by a standard of proof beyond a reasonable doubt that Mr. Debrew, Jr. knew that there was marijuana in the tractor trailer, or that he participated in a common plan to distribute it. *See Jones I*, 44 F.3d at 866. Mr. Debrew, Jr. did not own the tractor trailer in

which the marijuana was concealed; his father did.  There was no evidence to show that Jr.

had access to the locked trailer (to which Sr. produced the key upon request), or that Debrew,

Jr. had ever been in the trailer.  *See Jones I*, 44 F.3d at 868 (evidence insufficient to support

conspiracy conviction where, among other things, passenger "had no apparent access to or

control over the trunk" where cocaine bricks discovered).  Forensics examinations of the cell

phones subscribed to Debrew, Jr. did not link him to drug-trafficking activity.  *See id.*

(passenger "conspicuously absent" from phone records linking other defendants as co-

conspirators).  I conclude that the government did not meet its burden of proof with respect

to Mr. Debrew Jr.'s involvement in a drug-distribution conspiracy.  Accordingly, judgment

of acquittal will be entered as to Count I.

### 2.    Possession with Intent to Distribute (21 U.S.C. § 841)/Aiding and Abetting (18 U.S.C. § 2)

Count II of the *Superseding Indictment* in this case charged the offense of possession

with intent to distribute marijuana:

> On or about November 24, 2008, in Hidalgo County, in the District of New Mexico, the defendants, **NATHAN DAVID DEBREW, SR.** and **NATHAN DAVID DEBREW, JR.**, did unlawfully, knowingly and intentionally possess with intent to distribute 100 kilograms and more of a mixture and substance containing a detectable amount of marijuana.
>
> In violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), and 18 U.S.C. § 2.

[Doc. 55 at 2].

"To establish that a defendant possessed a controlled substance with intent to distribute, the government must prove that he '(1) possessed a controlled substance, (2) knew he possessed a controlled substance, and (3) intended to distribute the controlled substance.'" *United States v. Cesareo-Ayala*, 576 F.3d 1120, 1125 (10th Cir. 2009) quoting *United States v. Burkley*, 513 F.3d 1183, 1189 (10th Cir.2008)). Additionally, under 18 U.S.C. § 2, anyone who aids, abets, counsels, commands, induces or procures the commission of an offense is punishable as a principal. *See* 18 U.S.C. § 2. "In order to prove that a defendant aided and abetted the commission of a crime, the government must establish that the defendant willfully associated himself with the criminal venture and sought to make the venture succeed through some action of his own." *United States v. Isaac-Sigala*, 448 F.3d 1206, 1213 (10th Cir. 2006).

Possession of a controlled substance may be either actual or constructive. *United States v. Bowen*, 437 F.3d 1009, 1014 (10th Cir. 2006). In describing "constructive possession," the Tenth Circuit has explained that

> [a] person has constructive possession of an item when he knowingly holds the power and ability to exercise dominion and control over it. Dominion, control, and knowledge, in most cases, may be inferred if a defendant had exclusive possession of the premises; however joint occupancy alone cannot sustain such an inference. To prove constructive possession when there is joint occupancy of a vehicle, the government must present direct or circumstantial evidence to show some connection or nexus individually linking the defendant to the contraband. The government must present some evidence supporting at least a plausible inference that the defendant had knowledge of and access to the . . . contraband.

Id. (internal quotations and citations omitted).

### b.    Possession: The Evidence Against Mr. Debrew, Jr.

In this case, where Mr. Debrew, Jr. arguably jointly occupied the *tractor* portion of the vehicle with his father, there was no evidence presented that Mr. Debrew, Jr. was ever in—or was even able to access—the *trailer*.   There was no evidence presented that he handled the boxes in which the marijuana was found; instead, the evidence showed that Mr. Debrew, Sr. and the unidentified Hispanic man from whom he picked up the boxes loaded them onto the back of the trailer, and that Mr. Debrew, Sr. pushed them to the front.   The government did not present any evidence "supporting at least a plausible inference that [Jr.] had knowledge of *and access to*" the marijuana.   *United States v. Taylor*, 113 F.3d 1136, 1145 (10th Cir. 1997) (quoting *United States v. Mills*, 29 F.3d 545, 549-550 (10th Cir.1994)).

As for a possession conviction based upon the theory that Mr. Debrew, Jr. aided and abetted the offense,[3] the government argues that, to the extent Jr. maintains he was not a knowing participant in the events in question,

> [t]he evidence . . . refutes any such effort by Debrew, Jr. to forward a self-serving characterization of himself as an innocent onlooker. The evidence established that Debrew, Jr. "willfully associated" himself with, and aided, Debrew, Sr.'s possession with intent to distribute the marijuana by setting up the drug transaction and accompanying his father cross-country to pick up the marijuana with the intent to deliver it.

[Doc. 170 at 19-20].

---

[3]  Both Mr. Debrew, Jr. and the government appear to acknowledge that, with respect to Count II, Jr.'s conviction rests on an aiding-and-abetting theory. [See Doc. 170 at 18-20; Doc. 171 at 17-19].

Just as "[m]ere knowledge that drugs are present in a vehicle, without additional evidence to support a reasonable inference of a knowing agreement to distribute them, is insufficient to sustain a conspiracy conviction[,]" *Jones I*, 44 F.3d at 865, "[m]ere presence at a crime scene is insufficient to prove" possession with intent to distribute, pursuant to an aiding-and-abetting theory. *United States v. Delgado-Uribe*, 363 F.3d 1077, 1084 (10th Cir. 2004). Moreover, "[a]lthough knowledge [that] a crime is being committed is relevant, some showing of intent to further the criminal venture must be introduced at trial." *Id.* To be sure, both crimes (conspiracy and possession through aiding and abetting) "require at a minimum that the passenger was a knowing participant." *Jones I*, 44 F.3d at 869 n.2. Evidence insufficient to support a conviction for one of these crimes is likewise insufficient to support a conviction for the other. *See id.* ("Evidence insufficient to support [an] aiding and abetting conviction would likewise be insufficient to support a conspiracy conviction based on the same facts.").

As explained forth more fully above, there was no evidence presented that Mr. Debrew, Jr. knowingly agreed to participate in any conspiracy or that he willfully furthered the venture  through positive action. *See Jones I*, 44 F.3d at 870 (holding evidence insufficient to support conviction for possession with intent to distribute cocaine under aiding-and-abetting theory where "[t]here [was] no evidence [defendant] knowingly agreed to participate in the conspiracy or willfully furthered the venture through positive action."). Instead, Mr. Debrew, Jr. is linked to the marijuana by presence and proximity only, and this is not enough to sustain a conviction for possession with intent to distribute. *See United*

*States v. Reece*, 86 F.3d 994, 996 (10th Cir. 1996) (evidence failing to link defendant to narcotics "in any way other than presence and proximity" was insufficient to sustain possession-with-intent-to-distribute conviction).

Accordingly, judgement of acquittal will be entered as to Count II.

### B.      Federal Criminal Procedure Rules 29 (d) and 33

Federal Rule of Criminal Procedure 29(d) provides that where a defendant has brought both a Rule 29 motion for judgment of acquittal and a Rule 33 motion for a new trial, and the court grants the motion for judgment of  acquittal, "the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed."

Here Mr. Debrew, Jr. has filed a timely Rule 33 motion. [Doc. 172] "A motion for new trial should be granted if, 'after weighing the evidence and the credibility of the witnesses, the court determines that "the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred."'" *United States v. Garcia*,  182 F.2d 1165 (10th Cir. 1999) (quoting *United States v. Gabaldon*,  91 F.3d 91, 93-94) (10th Cir. 1996) (quoting *United States v. Evans*,  42 F.3d 586, 593)).  For the following reasons I find that at new trial is warranted in that the jury's verdict is contrary to weight of the evidence such that a miscarriage of justice may have occurred.

At trial, Officer Strain also testified that, as Mr. Debrew, Jr. exited the truck, his demeanor and expression conveyed to Officer Strain the message "I've been caught."  He further testified that "the expression on [Mr. Debrew, Jr.'s] face wasn't that of fearful or

afraid or scared, it was more as if the jig is up." According to Officer Strain, Mr. Debrew, Jr. did not appear worried or frightened or look like "somebody who has a gun in their face. . . ." I specifically do not find credible any of the foregoing trial testimony of Officer Strain. Notwithstanding his trial testimony concerning Mr. Debrew, Jr.'s demeanor and expression, Officer Strain confirmed on cross-examination that during the previous suppression hearing in this case he did not mention in any way Mr. Debrew Jr.'s demeanor or expression.  He further confirmed his prior suppression hearing testimony that his belief that Mr. Debrew, Jr. was connected to the marijuana in the truck was based solely on the fact that Mr. Debrew, Jr. was an unauthorized passenger who had been on board the vehicle for the entire trip.[4] The jury's consideration of this non-credible opinion testimony seriously and unfairly prejudiced Mr. Debrew, Jr.'s defense.

In my discussion of the sufficiency of the evidence, I have explained why I believe that the evidence was insufficient.  I have concluded that on the evidence adduced at trial no reasonable jury could maintain with the level of certitude required by proof beyond a reasonable doubt that Mr. Debrew, Jr. was a party to a conspiracy to possess a controlled substance with intent to distribute or that he knowingly possessed a controlled substance.

---

[4] See Doc. 105 at 53-54:

> Q.     Okay. So what information did you have that linked Mr. Debrew, Jr., to possessing this marijuana?
> A:     He was an unauthorized passenger on board of a commercial vehicle, and he was inside of the vehicle during the entire trip.

With one exception, Mr. Debrew Jr.'s statement that "this guy set me up," the evidence at trial was entirely consistent with the theory that Mr. Debrew, Jr. was merely along for the ride, and at the very worst knew only that his  father was engaged in some sort of  shady dealings with an unidentified person involving seven boxes of cargo picked up in Tucson, the exact nature of which was not known to Debrew, Jr. prior to his arrest at the Lordsburg Port of Entry.  Even if the jury was convinced that Mr. Debrew, Jr. suspected that his father was engaged in a conspiracy to smuggle drugs or other contraband, Mr. Debrew's decision to return home in his father's truck would not have made Mr. Debrew, Jr. a co-conspirator based on the evidence presented at trial.  *Riggins*, 15 F.3d at 994.  There is no evidence that Mr. Debrew, Jr., a passenger in a truck owned and operated by his father, had any voice in the decision to layover in California or to return home on I-10.  There is no direct evidence that Mr. Debrew, Jr. made the arrangements to pick up the drugs or that Mr. Debrew, Jr. was even present when Mr. Debrew, Sr. met with an unidentified  man and picked up the boxes containing the marijuana.  There is no evidence that Mr. Debrew, Jr. ever had  physical contact with the seven boxes of marijuana or that he had access to the inside of the trailer.  There is no evidence that Mr. Debrew, Jr. had any  role in preparing the false invoices for the seven boxes.  Considering that the government was unable to link  Mr. Debrew's cell phones to actual criminal activity, his possession of three cell phones has very little, if any probative value.

The one item evidence that I find inconsistent with a theory of innocence is Mr. Debrew's statement that "this guy set me up."  But this statement alone is insufficient to

overcome absolute absence of other, persuasive evidence that this particular defendant on this particular occasion  was involved in the smuggling of drugs.  As one Court aptly has observed:

> The line between permissible inference and impermissible speculation is not always easy to discern. When we "infer," we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation  between those facts and the conclusion.  If that correlation is sufficiently compelling, the inference is "reasonable."  But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable.  At some point, the link between the facts and the conclusion becomes so tenuous  that we call it "speculation."  When that point is reached is, frankly, a matter of judgment.

*Goldhirsh Group, Inc. v. Alpert*, 107 F.3d 105, 108 (2d Cir. 1997).  It is my judgment that a jury could have found Mr. DeBrew, Jr. guilty beyond a reasonable doubt only through impermissible speculation. There are two many gaps in the government's case, and the inferences required to bridge the gaps in the government's evidence impress me as having a relatively weak correlation to the predicate facts actually established by the government. And once again I must stress that proof beyond a reasonable doubt requires evidence so compelling as to allow the jury to reach "a subjective state of near certitude of the guilt of the accused."

## III. CONCLUSION

That a jury verdict will not lightly be overturned is clear from the standard the Court applies when considering a motion for judgment of acquittal under Rule 29 – when viewed in a light most favorable to the government, could a reasonable jury have found the defendant

guilty beyond a reasonable doubt?  *See Bowen*, 437 F.3d at 1014.  Equally true, however, is that "[a] verdict . . . based upon a guess or mere possibility cannot be upheld[,]" *see Reece*, 86 F.3d at 997, nor can one that is reached by "pil[ing] one inference upon another[,]" *see Jones II*, 49 F.3d at 633.  I conclude that this is what underlies the conspiracy and possession convictions as to Mr. Debrew, Jr.

Further, I am persuaded that under the standards of Rule 33, Mr. Debrew's conviction cannot stand.  I find that his conviction was based in part on the testimony of Officer Strain, whose testimony concerning Mr. Debrew, Jr.'s demeanor I find not credible.  In addition, I have found that there are substantial gaps in the government's proof and that the inferences that the government relies upon to bridge those gaps amount to impermissible speculation,

**IT IS THEREFORE HEREBY ORDERED** that Nathan David Debrew, Jr.'s *Motion for a Judgment of Acquittal*, made orally on January 27, 2010 pursuant to Rule 29 of the Federal Rules of Criminal Procedure and renewed on January 28, 2010, [Doc. 171] is **GRANTED** with respect to Count I of the *Superseding Indictment*;

**IT IS FURTHER ORDERED** that Nathan David Debrew, Jr.'s *Motion for a Judgment of Acquittal*, made orally on January 27, 2010 pursuant to Rule 29 of the Federal Rules of Criminal Procedure and renewed on January 28, 2010, [Doc. 171] is **GRANTED** with respect to Count II of the *Superseding Indictment*;

**IT IS FURTHER ORDERED** that a judgment of acquittal shall be entered by separate document;

32

**IT IS FURTHER ORDERED** that *Defendant Debrew Jr.'s Motion in the Alternative for New Trial Pursuant to Federal Rule of Criminal Procedure 33* [Doc. 172] is **CONDITIONALLY GRANTED** as to Counts I and II of the Superseding Indictment;

**SO ORDERED** this 26th day of April, 2011, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge

33